**GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND**

v.

**NORTHSTAR SERVICES, LTD., Albert E. Cantwell, and Panalpina, Inc.**

No. Civ. B–94–889.

United States District Court, D. Maryland.

Feb. 6, 1998.

Robert Martin, Washington, DC, for Plaintiff.

William A. Hylton, Jr., Hylton & Gonzales, Baltimore, MD, Andrew R. Spector, Hyman & Kaplan, Miami, FL, for Defendant Panalpina, Inc.

## MEMORANDUM OPINION

WALTER E. BLACK, Senior District Judge.

Plaintiff, the Government of the United Kingdom of Great Britain and Northern Ireland ("United Kingdom") brings this action against Northstar Services, Ltd. ("North-star"), Albert E. Cantwell, and Panalpina, Inc. ("Panalpina") alleging negligence and breach of contract in the transport of a portion of a degaussing range, a containerized data gathering system, valued at over $1.5 million. The degaussing range was to be used in a joint defense exercise at sea being conducted by the governments of the United States and the United Kingdom. The degaussing range was severely damaged when it was knocked off the truck on which it was being carried after the truck driver attempted to pass under a bridge with inadequate clearance. In Count One of the amended complaint, plaintiff alleges that Cantwell, an owner/operator truck driver, negligently drove the truck carrying the equipment by failing to clear a bridge resulting in damage to the cargo. In Count Two of the amended complaint, plaintiff alleges that Northstar, a trucking company, negligently hired, trained, and supervised Cantwell in the transportation of the United Kingdom's equipment. In Count Three, plaintiff alleges that Panalpina, an international freight forwarder and customs broker, breached its contractual duty to inquire into Northstar's financial condition and insurance coverage, to use reasonable care selecting a trucking company, as well as to inform Northstar of the nature, size, and value of the United Kingdom's shipment in arranging inland transportation.

Northstar impleaded several insurance companies into the case; however, all have since been dismissed. Northstar subsequently consented to liability prior to trial.[1] On the first day of this bench trial, the plaintiff dismissed its negligence claim against Cantwell, leaving Panalpina as the sole party defendant.

This case was tried to the Court from October 16, 1997, through October 21, 1997. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

## I.

The United States and United Kingdom have been involved in joint defense exercises

---

1. Panalpina filed a Suggestion of Bankruptcy on October 31, 1997, stating that Northstar filed a voluntary Petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey, No. 97–13419.

for many years. One of the components furnished by the United Kingdom for use in exercises at sea was a degaussing range. The degaussing range used in the early 1990s was a transportable data gathering system which was deployed at a specified water depth to monitor and minimize the magnetic signature of surface and sub-surface vessels. The range was a series of sensors attached to cables and a custom built container. The "brains" of the degaussing system was housed in a ten-foot container which functioned as the control center and is the subject of this litigation. The magnetic signatures of sea vessels are significant because they can set off underwater enemy mines. A degaussing range therefore is an important tool to minimize the signatures allowing United Kingdom and United States vessels to travel more safely in enemy waters.

In March 1993, the United Kingdom sought to ship the ten-foot container of the only transportable degaussing range ("TR102A") existing at that time to the David Taylor Model Basin ("Model Basin") in Montgomery County, Maryland. The shipping officer at the United Kingdom Defence Procurement Office of the British Embassy in the United States, T.W. Peel, handled most shipments to and from the United Kingdom. In mid-March 1993, Peel telephoned Donna P. Finnell, then an import clerk at Panalpina's Baltimore office ("Panalpina Baltimore") to arrange for customs clearance and inland transportation of the ten-foot container to the Model Basin. Peel then followed up with a letter to Finnell dated March 22, 1993, giving her the consignee's name, a packing list stating the contents of the container and their monetary values, and a customs license. There is no evidence that Peel ever informed Finnell directly that the goods need special handling or higher insurance coverage due to its high value.

Upon receipt of Peel's letter and attachments, Finnell filled out the paper work for customs clearance. In calculating the value of the shipment for customs documents, she misunderstood the "K" following the British pound figure as printed on the packing list, and consequently omitted it on the United States Department of Treasury Customs Form. The total value listed on the packing list is £622K (£622,000) which the parties agree converts to approximately $934,000. Finnell, however, noted the total value as only $934.00.

As part of Peel's request, Finnell arranged for inland transportation. She chose Northstar for inland transportation of the container to the Model Basin. Finnell testified that she knew that many of the steamship companies doing business in the port of Baltimore used Northstar and that it had a good reputation. Panalpina relied on the steamship companies' truckers because steamship companies engage trucking companies only after thorough investigations of them. Among other things, insurance certificates are requested and reviewed by the steamship companies. Northstar had also been used by Panalpina Baltimore many times before the accident without any problems and Finnell was satisfied with their rates and service. Moreover, Finnell had previously had favorable dealings with Ronald D. Gartrell who was employed by Northstar at the time.

Northstar had its own trucks in the Philadelphia–New Jersey area, but in Baltimore it engaged owner/operators to transport its customers' cargo. Cantwell is an owner/operator who was working through another trucker, Bennie Davidson, at the time of the accident. Davidson had a contract with Northstar to provide truck drivers. The day of the accident, Cantwell met Gartrell of Northstar at the pier in Baltimore to pick up the ten-foot container. The container was sitting on a flatrack used to secure the entire load onto the truck. The flatrack is a two-sided frame with a bottom and when sitting upright looks "U"-shaped as demonstrated by a wooden model used by defense counsel during cross-examination of Cantwell. The flatrack adds one foot to the total height of the container. Cantwell testified that he was aware that the container, while placed on the flatrack, was slightly higher than the height of the sides of the flatrack, but he did not measure the total height of the load before embarking on the trip to the Model Basin.

Cantwell received directions to the Model Basin over the phone from William Becker, the dispatcher at Northstar. The directions,

as given, were to take the truck along highways and roads without any low overpasses. Not being familiar with the area, Cantwell missed the last right-hand turn before the Model Basin entrance and turned instead onto MacArthur Boulevard where he encountered a bridge that was lower than the top of the container. The container hit the bridge and was knocked off the truck.

The degaussing range sustained serious damage as a result of the accident. Extreme measures were undertaken to assess the harm to the degaussing range and alternative plans were made to fulfill requirements for the upcoming sea trials in Norfolk, Virginia and The Virgin Islands. The Court accepts plaintiff's assertions that the losses incurred by the United Kingdom as a result of this unfortunate accident were extensive.

## II.

The initial issue before the Court is to determine what established the contract between the United Kingdom and Panalpina. In this case, the telephone conversation between Peel and Finnell created an oral contract for Panalpina's customs broker and international freight forwarding services with respect to the United Kingdom's degaussing range. The terms and conditions found on the reverse side of Panalpina's invoice are also part of this contract by virtue of a course of dealing between the United Kingdom and Panalpina Baltimore.

Plaintiff argues that the contract does not include the terms and conditions. Plaintiff finds the existence of a three-year contract between the United Kingdom and Panalpina's Sterling, Virginia office ("Sterling contract") where the terms and conditions were withdrawn from all covered transactions, coupled with the "ad hoc" contracts not covered by the Sterling contract, creates a confusing array of communications that cannot possibly give rise to a uniform ascertainable course of dealing.

In response, defendant contends that the contract does include the terms and conditions printed on the reverse side of all its invoices because of their presence in every transaction. Defendant contends that over the course of at least 100 transactions between the United Kingdom and Panalpina Baltimore, the terms and conditions appeared on every invoice without any affirmative exclusionary provision. This established a course of dealing whereby the terms and conditions became part of the contract. The significance of the terms and conditions is a limit on Panalpina's liability to $50 for any loss or damage to the shipper's goods as a result of its own negligence, which it emphatically denies, and a complete limit on Panalpina's liability for loss or damage to the goods as a result of a third party's negligence.

■ The Court agrees that the invoice terms and conditions are part of this contract. The prior dealings of the United Kingdom and Panalpina point to such a conclusion. A general principle of contract law allows for the parties' course of dealing to "give meaning to" the terms of a contract. *Restatement (Second) of Contracts* § 223. Section 223 of the *Restatement (Second)* states:

> (1) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

> (2) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.

*Id.* The Comment to § 223 further explains that a course of dealing "*may annex an agreed but unstated term* " and "[t]here is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown, nor is it required that the course of dealing be consistent with the meaning the agreement would have apart from the course of dealing." *Id.* cmt. B (emphasis added); *see also* John D. Calamari & Joseph M. Perillo, *Contracts,* 178–79 (3d ed.1987) (describing course of dealing and referring to U.C.C. § 1–205(1)).

A course of dealing between the United Kingdom and Panalpina has been established in this case. Peel or a member of his staff in the Defence Procurement Office would call

the appropriate Panalpina office to request freight forwarding and inland transportation services. Licenses and other information would be sent to Panalpina. Panalpina would then process the request by completing the paperwork involved with the shipment and arranging for inland transportation of the shipment to its final destination within the United States. Upon completion of its services, Panalpina would submit an invoice to the Defence Procurement Office for payment.

Printed on the reverse side of every invoice sent to Panalpina offices were the Terms and Conditions of Service. This practice occurred more than 100 times with Panalpina Baltimore prior to the accident on April 1, 1993, clearly establishing a "course of dealing." The only deviation from this practice occurred with Panalpina's office in Sterling, Virginia ("Panalpina Sterling"). Peel testified that the United Kingdom sent most of its shipments through the Panalpina Sterling office which had been covered by a three-year contract ending in December 1992, explicitly excluding Panalpina's terms and conditions from all contracts. There were transactions, however, where the three-year contract was not applicable because of special shipments. These special transactions were considered "ad hoc" and not part of the regular fixed arrangement between the United Kingdom and Panalpina Sterling.

This special contract with Panalpina Sterling only strengthens the inference that all other transactions not covered by the Sterling contract do include the terms and conditions. The express exclusion of the terms and conditions in the Sterling contract suggests that all other contracts not covered by the exclusion provision, such as the one at issue in this case, are subject to the Terms and Conditions of Service where there were no affirmative exclusions of such terms. Peel testified that the Panalpina Sterling exclusionary provision was entirely separate from the contracts with Panalpina Baltimore. Accordingly, Panalpina Baltimore contracts were not covered by the explicit exclusionary provision. In addition, the Panalpina Sterling terms and conditions exclusion lapsed in December 1992, with no renewal. By March 1993, the time frame of the contract at issue, there was no special exclusionary provision in effect at all between the United Kingdom and any Panalpina office.

Most instructive is the fact that Peel testified he was aware of the terms and conditions on the back of Panalpina's invoices and had even endeavored to read them on occasion.[2] The terms and conditions are those approved by the National Customs Brokers & Forwarders Association of America, Inc. of which the majority of customs brokers and freight forwarders are members according to defendant's expert in the customs broker field, Sigmund Shapiro. Moreover, under the *Restatement (Second) of Contracts* § 222, usage of trade may be used to supplement a contract. Section 222 states in part: "(1) A usage of trade is a usage having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement...." *Restatement (Second) of Contracts* § 222 (1979); *see also* Calamari & Perillo, *supra,* at 179–81 (describing usage of trade and referring to U.C.C. § 1–205(2)). Thus, not only does a course of dealings suggest Peel and the United Kingdom were aware that the terms and conditions applied, but it was the custom of the trade for the terms and conditions to be printed on every invoice.

Given the finding that the Terms and Conditions of Service are part of the contract at issue in this case, the next issue that the Court must address is the terms of the contract. The instructive provisions on Panalpina's liability where the goods are in possession of a third party are paragraphs 1 and 2 which state in part:

1. **Services by Third Parties.** Unless the Company carries, stores or otherwise physically handles the shipment and loss, damage, expense or delay occurs during such activity, the Company assumes no liability as a carrier and is not to be held

---

**2.** The top of the terms and conditions reads, "**TERMS AND CONDITIONS OF SERVICE—** *(Please Read Carefully)*" (emphasis in original).

responsible for any loss, damage, expense or delay to the goods to be forwarded or imported . . . subject to the limitations of paragraph 8 below, but *undertakes only to use reasonable care in the selection of carriers, truckmen . . . and others* to whom it may entrust the goods for transportation . . . .

    **2. Liability Limitations of Third Parties.** The Company is authorized to select and engage carriers, truckmen . . . and others, as required, to transport, store, deal with and deliver the goods . . . . *The Company shall under no circumstances be liable for any loss, damage, expense or delay to the goods for any reason whatsoever when said goods are in custody, possession or control of third parties selected by the Company* to forward, enter and clear, transport or render other services with respect to such goods.

Terms and Conditions of Service, at ¶¶ 1 and 2 (Rev.9/87) (emphasis added).

These paragraphs clearly state that Panalpina is not responsible for any loss or damage to a shipment while in the custody of a third party, even one it selects. Thus, Panalpina cannot be found liable for damage to the United Kingdom's container simply on the theory that the third party it engaged for inland transportation caused the accident.[3]

In this case, plaintiff alleges that Panalpina breached its duty to use reasonable care in (1) failing to use reasonable care in selecting a trucking company, (2) failing to inform the trucking company of the nature, size, and value of the shipment, and (3) failing to obtain financial and insurance coverage information of the trucking company. Amended Complaint, at ¶¶ 28 & 29. The first duty is found in paragraph 1 of the Terms and Conditions of Service, obligating Panalpina to use "reasonable care in the selection of carriers, truckmen, lightermen, forwarders, customs brokers, agents, warehousemen and others to whom it may entrust the goods for transportation . . . ." Terms and Conditions of Service, at ¶ 1.

In response, defendant argues that its practice of engaging reputable trucking companies listed by the steamship companies in the Port of Baltimore meets its reasonable care obligation. Defendant also argues that Cantwell was responsible for noticing the load was possibly over height. Panalpina personnel never actually saw the container. Finnell testified that Peel had dealt with her many times in the past and he never requested special handling or inquired about the trucking company's insurance policy. In fact, only one month after the accident, Peel requested Finnell to arrange similar customs clearance and inland transportation for another shipment of highly valuable defense equipment and did not ask for special measures to be taken to ensure its safe delivery. Panalpina questions plaintiff's theory that defendant has a duty to notify third parties of special handling when the United Kingdom itself did not so notify its customs broker. Finally, in response to plaintiffs third allegation, Claus Plath, Panalpina Baltimore's Branch Manager, testified he understood that the steamship companies carefully checked out a trucking company, including insurance coverage, before engaging them in business. Panalpina claims there is no duty to inquire into a trucking company's insurance coverage, and plaintiff has provided no testimony establishing such a duty of care in the industry.

    The Court first notes that there is no law that imposes any specific duties on Panalpina as plaintiff so claims. Torts duties cannot be created out of contracts. *See Parker v. Columbia Bank,* 91 Md.App. 346, 366, 604 A.2d 521 (holding that a duty of good faith does not impose additional affirmative obligations on the promisor, but rather it simply prohibits a party from acting in a manner which hinders the other party's performance), *cert., denied,* 327 Md. 524, 610 A.2d 796 (1992); see also *Dupont Heights Ltd. Partnership v. Riggs National Bank of Washington, D.C.,* 949 F.Supp. 383, 390

---

**3.** In any event, paragraph 8 of the Terms and Conditions of Service on the reverse side of the March 31, 1993 invoice for the United Kingdom's shipment states in part: "[T]he Customer agrees that *the Company shall in no event be* *liable for an loss, damage, expense or delay to the goods resulting from the negligence or other fault of the Company for any amount in excess of $50 per shipment* (or the invoice value, if less) . . . ." *Id.* at ¶ 8 (emphasis added).

(D.Md.1996) ("[T]he point is that Maryland law does not obligate a lender to take actions not required under the loan documents and no independent duty of good faith and fair dealing imposes further obligations.") In the *Parker* case, a bank's failure to protect the interests of the borrowers by "monitoring [the builder's] work to make sure that the loan was in balance and that [the builder] was performing the work covered by each draw" is an additional obligation that the bank "was clearly *not* required to take under the loan agreement." *Id.* (emphasis in original).

■ Contractual duties must therefore derive from the contract itself. Paragraph 1 of the Terms and Conditions of Service is thus the basis for a general reasonable care obligation on the part of Panalpina and the Court finds that Panalpina satisfied its obligation to use reasonable care in selecting a trucking company.

First, Panalpina took reasonable measures to select a reputable trucking company. Panalpina relied on the recommendations of the steamship companies who entrust their own cargo to these trucking companies. Moreover, Panalpina had used Northstar numerous times in the past. According to exhibits submitted at trial, Panalpina and Northstar had engaged in 102 transactions during the period from October 1, 1992 to March 5, 1993. Finnell testified that other employees in the office had been satisfied with Northstar's service.

Second, under the circumstances, Panalpina gave Northstar sufficient information for it to transport the shipment safely given the trucking company's expected expertise in hauling a variety of sizes of containers. Cantwell saw the container firsthand at the dock, while Panalpina personnel never saw it at all. Moreover, even if Panalpina had explicitly notified Northstar of a potential height problem, this would not have affected the cause of the accident. Cantwell testified that he made a wrong turn, deviating from the directions he was given by Northstar. Northstar's directions did not involve any need to negotiate low overpasses. Only when Cantwell missed his turn did he encounter the overpass that caused the damage to the container.

Third, Panalpina did not breach any duty of reasonable care in failing to inquire directly into Northstar's insurance coverage prior to entrusting them with the cargo. Panalpina had good reason to expect that Northstar had sufficient insurance coverage because the steamship companies have rigorous requirements for trucking companies they use including adequate insurance and a good reputation. Panalpina checked up on the trucking companies through the equipment managers of the steamship and railroad lines. The Court finds these steps sufficient to meet a reasonable care standard and, accordingly, plaintiff's claim that defendant breached this duty of reasonable care is unfounded.

The Court further notes that even if the Terms and Conditions of Service are not controlling with respect to the contract at issue, plaintiff's position that defendant breached an implied duty to use reasonable care fails. As stated *supra*, Panalpina used reasonable care in selecting Northstar to transport the cargo. Panalpina's conduct throughout the transaction satisfies an alleged implied duty to use reasonable care. Accordingly, the Court finds defendant did not breach any contractual obligation it owed to plaintiff.

### III.

For all the foregoing reasons, the Court finds defendant not liable for breach of contract. Judgment will be entered in accordance with this Memorandum Opinion.

### ORDER OF JUDGMENT

In accordance with the Memorandum Opinion filed herein on this date, IT IS, this 6th day of February, 1998, by the United States District Court for the District of Maryland,

ORDERED:

(1) That JUDGMENT is ENTERED in favor of defendant Panalpina, Inc. against the Government of the United Kingdom of Great Britain and Northern Ireland;

(2) That any and all prior rulings made by the Court disposing of any claims

against any parties are incorporated by reference herein, and this order shall be deemed to be a final Judgment within the meaning of Fed.R.Civ.P. 58; and

(3) That the Clerk shall mail a copy of this Memorandum Opinion forthwith to counsel of record.