PRIMA U.S. INC., Plaintiff,

M/V Addiriyah, Her Engines, Boilers, etc., Defendant,

United Arab Shipping Company, Defendant–Third–Party– Plaintiff,

Westinghouse Electric Corp., Third– Party–Defendant–Fourth–Party– Plaintiff–Appellee,

v.

PANALPINA, INC., Fourth–Party– Defendant–Appellant.

No. 99–9025.

United States Court of Appeals, Second Circuit.

Argued: May 25, 2000

Decided: Aug. 24, 2000

element, to the issue of how an enterprise acts, and to the issue of predicate racketeer-

ing acts.

James DeMorscia, Sonageri & Fallan, Garden City, N.Y. (James L. Sonageri, of counsel), for Third–Party–Defendant–Fourth–Party–Plaintiff–Appellee.

Andrew R. Spector, Hyman & Kaplan, P.A., Miami, FL (Nicholas E. Pantelopoulos, Biedermann, Hoenig, Massamillo & Ruff, P.C., New York, NY, of counsel), for Fourth–Party–Defendant–Appellant.

Before: McLAUGHLIN and CALABRESI, Circuit Judges, and MUKASEY, District Judge.*

## BACKGROUND

McLAUGHLIN, Circuit Judge:

The Westinghouse Electric Corporation ("Westinghouse") contracted in writing with Panalpina, Inc. ("Panalpina"), a "freight forwarder," for the transportation and shipment of an electric transformer from the manufacturer (in Italy) to the ultimate consignee, the 3M Corporation (in Iowa). Panalpina, as freight forwarder, was to oversee all of the transportation for the transformer, both on land and over sea. Aware of its obligation, Panalpina stated to Westinghouse, "rest assured your shipment will receive door to door our close care and supervision. . . ."

Panalpina's obligations under the contract included ensuring that the transformer was properly secured and lashed onto a flat-rack for ocean shipment. Westinghouse paid Panalpina $21,785.00, for its services. As is the industry custom, Panalpina did not issue a bill of lading for the shipment.

Westinghouse and Panalpina had done business on countless occasions. Pursuant to the standard terms and conditions listed on the reverse side of its contract, Panalpina undertook to exercise "reasonable care" in the selection of those who would actually carry, store or otherwise handle the goods. The standard terms also limited Panalpina's liability for losses to $50 per shipment, and they disclaimed liability for all consequential or special damages in excess of this amount. These were the same terms utilized in the prior ten-year course of dealing involving over 1,000 transactions between Westinghouse and Panalpina.

When the time came to ship the transformer, Panalpina arranged for it to be picked up at a factory in Melegano, Italy, and brought to the Port of Genoa for an ocean trip. In Genoa, Panalpina hired Ligure Toscano, a customs broker, to coordinate the movement of the transformer through the Genoa Port. Because the transformer was oversized, it had to be secured to a forty foot "flat-rack" container for ocean shipment. Through Toscano, Panalpina hired CSM, a local stevedore, to load the transformer onto the appropriate container, and to lash it securely for the trip. The transformer, on its flat-rack, was loaded aboard the M/V Addiriyah for the voyage to the United States.

Panalpina never inquired of CSM how the transformer was lashed for the ocean voyage. Nor did it supervise the endeavor. On the other hand, Westinghouse never requested that Panalpina be present at any point during the shipment of the transformer, and specifically retained Panalpina only to arrange for the various services in connection with the export of the transformer from Italy to the United States. CSM, moreover, was a well-known stevedore and had often been utilized by other well-known freight forwarding companies, including the United Arab Shipping Company (owner of the M/V Addiriyah, the ship that carried the transformer).

During the ocean voyage, the M/V Addiriyah encountered heavy seas and the transformer, which CSM had negligently lashed to its flat-rack, broke loose, crushing a laser cutting machine owned by Prima (U.S.A), Inc. ("Prima").

In 1998, Prima, via its subrogated insurer, filed a complaint in the United States District Court for the Southern District of New York (Hellerstein, *J.*), against: (1) the United Arab Shipping Company ("United") (as owner of the M/V Addiriyah); (2) Westinghouse; and (3) Panalpina. Prima sought damages for the loss of its laser. United filed a third-party action against Westinghouse for indemnification, and for clean up costs related to some silicon that had spilled from the broken transformer. A fourth-party action was then filed by Westinghouse against Panalpina for indemnification.

Panalpina moved for summary judgment, dismissing: (1) Westinghouse's fourth-party action; and (2) Prima's direct suit. The district court denied both prongs of the motion.

At a bench trial, the district court then awarded: (1) Prima $2500.00 from United; (2) United $103,508.19 from Westinghouse for the costs of cleaning up the spilled silicon; and (3) Prima $260,000.00 from Westinghouse for the broken laser. The court held that Westinghouse was directly liable to United for the spilled silicon; and directly liable to Prima for the broken laser, because Westinghouse had stipulated that it was engaged in a maritime venture, and thus subject to the Carriage of Goods by Sea Act ("COGSA"). 46 U.S.C.App. § 1300 *et seq.*

The district court went on to find Panalpina liable to Westinghouse, in indemnity, for both the spilled silicon and the broken laser awards, because the contract that Panalpina had entered with Westinghouse stated that Panalpina would give "door to door ... close care and supervision." Because of that clause in the contract, the court found that any negligence of the

stevedore, CSM, in lashing the transformer was imputed to Panalpina.

Panalpina now appeals, challenging the district court's decision that it must indemnify Westinghouse for CSM's negligent actions. Panalpina asserts that it is only a freight forwarder, and hence, should not be made to indemnify Westinghouse.

## DISCUSSION

■ This court reviews conclusions of law, as well as mixed questions of law and fact, *de novo*. *See In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir.1990); *Muller v. Committee on Special Educ. of East Islip Union Free Sch. Dist.*, 145 F.3d 95, 102 (2d Cir.1998). We apply a *de novo* standard in this case because the question whether an entity is a freight forwarder is a mixed question of law and fact.

### I. *Panalpina was a freight forwarder, not a carrier*

■ The job of a non-vessel operating common carrier ("NVOCC") is to consolidate cargo from numerous shippers into larger groups for shipment by an ocean carrier. *See Chicago, Milwaukee, St. Paul & Pacific R.R. Co. v. Acme Fast Freight, Inc.*, 336 U.S. 465, 467–68, 69 S.Ct. 692, 93 L.Ed. 817 (1949); *Insurance Co. of North America v. S/S American Argosy*, 732 F.2d 299, 300–01 (2d Cir.1984). A NVOCC—as opposed to the actual ocean carrier transporting the cargo—issues a bill of lading to each shipper. If anything happens to the goods during the voyage the NVOCC is liable to the shipper because of the bill of lading that it issued. *See Modern Office System, Inc. v. AIM Caribbean Express, Inc.*, 802 F.Supp. 617, 623 (D.P.R.1992); *Fireman's Fund American Insurance Cos. v. Puerto Rican Forwarding Co.*, 492 F.2d 1294, 1296 (1st Cir. 1974).

■ A freight forwarder like Panalpina, on the other hand, simply facilitates the movement of cargo to the ocean vessel. The freight forwarder:

secure[s] cargo space with a steamship company, give[s] advice on governmental licensing requirements, proper port of exit and letter of credit intricacies, and arrange[s] to have the cargo reach the seaboard in time to meet the designated vessel.

*New York Foreign Freight Forwarders and Brokers Ass'n v. Federal Maritime Comm'n*, 337 F.2d 289, 292 (2d Cir.1964); *see also*, 46 C.F.R. § 510, *et. seq.* Freight forwarders generally make arrangements for the movement of cargo at the request of clients and are vitally different from carriers, such as vessels, truckers, stevedores or warehouses, which are directly involved in transporting the cargo. Unlike a carrier, a freight forwarder does *not* issue a bill of lading, and is therefore not liable to a shipper for anything that occurs to the goods being shipped. *See United States v. American Union Transport*, 327 U.S. 437, 442–43, 66 S.Ct. 644, 90 L.Ed. 772 (1946) (stating that independent forwarders "assume no responsibility for the transportation of goods"). As long as the freight forwarder limits its role to arranging for transportation, it will not be held liable to the shipper. *See J.C. Penney v. The American Express Co.*, 102 F.Supp. 742, 747 (S.D.N.Y.1951); *Zima Corp. v. M/V Roman Pazinski*, 493 F.Supp. 268, 273 (S.D.N.Y.1980); *Consolidated Int'l Corp. v. S.S. Falcon*, 563 F.Supp. 969 (S.D.N.Y.1983).

Panalpina did not issue a bill of lading and it did not consolidate cargo. It was hired by Westinghouse simply as a freight forwarder to arrange for the transportation of a transformer from Italy to Iowa. By analogy, Panalpina was hired to act as a "travel agent" for the transformer: it set things up and made reservations, but did not engage in any hands-on heavy lifting. Admittedly, Panalpina did state that Westinghouse's "shipment [would] receive door to door our close care and supervision...." However, because of the well settled legal distinction between forwarders and carriers, that statement—mere

puffing—cannot transform Panalpina into a carrier, and bestow liability upon it.

In *Government of the United Kingdom of Great Britain and Northern Ireland v. Northstar Services, Ltd.*, the District Court of Maryland held that Panalpina (in another dispute) was not liable to a plaintiff that had hired it as a freight forwarder. 1 F.Supp.2d 521 (D.Md.1998). In *Northstar*, the trucking company that Panalpina had hired to move cargo damaged that cargo, and Panalpina was sued in its role as the freight forwarder for having breached its duty to inquire into Northstar's reputation and practices. The district court there held that Panalpina took reasonable measures in hiring Northstar, and, as a mere facilitator, was not responsible for the negligence of the trucker. *Id.*

 This case is much like *Northstar*. Panalpina was a freight forwarder, hired by Westinghouse to arrange for transportation and incidental services, and to select the companies that would perform those tasks. It was not a carrier, and is therefore not responsible for the damages caused by the poorly lashed transformer.[1]

■ Moreover, when a freight forwarder selects someone to perform transportation services, that selection fulfills the forwarder's obligations in the absence of proof that the selection itself was negligent. *See John Brown Engineering, Ltd. v. Hermann Ludwig, Inc.*, 1991 A.M.C. 2540 (D.S.C.1991).

Panalpina hired CSM as a stevedore to load and lash the transformer. CSM was the same stevedore that was used by United Arab Shipping, and was the designated official Port of Genoa stevedore. Panalpina clearly acted reasonably in hiring CSM on behalf of Westinghouse, fulfilling its duties as a freight forwarder. Panalpina

is not liable to Westinghouse for CSM's negligent actions.

## CONCLUSION

For the foregoing reasons, we RE-VERSE the district court's order that Panalpina indemnify Westinghouse, and remand to the district court to enter judgment accordingly.

---

1. Of course a party that calls itself a freight forwarder might in fact be performing the functions of a carrier, in which case function would govern over form. But the burden of demonstrating any deviation from what freight forwarders normally do in the maritime context must rest, and heavily so, on the party who would show such deviation. *Cf. Chicago, Milwaukee, St. Paul & Pacific R.R. Co. v. Acme Fast Freight, Inc.*, 336 U.S. at 467, 69 S.Ct. 692 (applying the term "freight forwarder" in the railroad context to entities that consolidate cargo and issue bills of lading).