SCHOLASTIC INC. et al., Plaintiffs,

v.

M/V KITANO, et al., Defendants, etc.

Nos. 02 CIV. 2997(DC),
02 CIV. 6389(DC).

United States District Court,
S.D. New York.

March 31, 2005.

Picillo, Caruso, O'Toole By Steven A. Weiner, Esq., Nutley, NJ, for Third–Party Plaintiff.

Barry N. Gutterman & Associates, P.C., By Barry N. Gutterman, Esq., Robert Briere, Esq., New York, NY, for Third–Party Defendants.

## *OPINION*

CHIN, District Judge.

On March 22, 2001, a fire broke out on the M/V Kitano as it was at sea. The fire was not extinguished until the next day, and a number of containers of cargo were damaged.

These related admiralty cases were filed by cargo owners against, *inter alia*, the vessel owner as well as General Carbon Corporation ("General Carbon"). General Carbon owned two forty-foot containers of activated carbon that were being shipped aboard the vessel. The fire apparently started in one of the two containers.

General Carbon filed third-party claims against certain third-party defendants, Navtrans International Freight Forwarding, Inc. and related entities (collectively, "Navtrans"). Navtrans was the intermedi-

ary hired by General Carbon to arrange for the shipment of its two containers of activated carbon. All claims in the cases were eventually settled, except for (i) General Carbon's claims against Navtrans for contribution and indemnification for the sums paid by General Carbon to settle the other claims in the case, and for damages for its own cargo loss, and (ii) Navtrans's claims against General Carbon for contractual indemnification for attorneys' fees and costs incurred in this litigation.

General Carbon and Navtrans agreed to a summary trial on stipulated documents, jointly submitted depositions, and stipulated facts. Upon consideration of the evidence and the arguments of the parties, the Court will enter judgment in favor of Navtrans, dismissing General Carbon's claims against it and awarding Navtrans attorneys' fees and costs. Pursuant to Fed.R.Civ.P. 52, my findings of fact and conclusions of law follow.

### FACTS

#### 1. The Parties

General Carbon is a company that distributes activated carbon. Activated carbon is "a highly absorbent powdered or granular carbon made usually by carbonization and chemical activation and used chiefly for purifying by adsorption."[1] Merriam–Webster Collegiate Dictionary (10th ed.2000). Uses of activated carbon include water and air purification and odor removal. General Carbon also assembles and sells activated carbon filtration equipment, and processes activated carbon, "impregnating" it with chemicals to increase the efficiency of the carbon's adsorption. (Muller Dep. at 11, 14–15, 35).

Navtrans[2] acts as an intermediary between shippers and carriers, arranging for shipments of goods in overseas transport. (Amended Third–Party Compl. ¶ 20; Amended Third–Party Answer ¶ 20).

#### 2. Activated Carbon Impregnated with Potassium Hydroxide

General Carbon produced, upon the request of its customer, Johnson Pacific Pte. Ltd. ("Johnson Pacific"), activated carbon impregnated with potassium hydroxide ("impregnated activated carbon").[3] General Carbon acquired the activated carbon

---

1. "Adsorption" is "the adhesion in an extremely thin layer of molecules (as of gases, solutes, or liquids) to the surfaces of solid bodies or liquids with which they are in contact." Merriam–Webster Collegiate Dictionary (10th ed.2000). In contrast to absorption, in which molecules are drawn into the internal structure of the absorbent, adsorption involves the adhesion of molecules to the adsorbent's surface.

2. General Carbon's Amended Third–Party Complaint names Navtrans International Freight Forwarding, Inc.; Sirva Freight Forwarding, Inc.; Navtrans Container Lines, Inc.; Sirva Container Lines, Inc.; North American Van Lines, Inc.; and Sirva, Inc.; as well as additional defendants (e.g., Rose Container Line Inc., World Trade Transport, North American Logistics). The Amended Third–Party Answer is on behalf of only the six afore-mentioned defendants. General Carbon refers only to the same six defendants in its trial briefs. General Carbon does mention some of the other defendants, stating that "Navtrans was a wholly owned subsidiary of Third Party Plaintiff [sic] North American Van Lines, Inc., Customized Logistics Services and/or SIRVA, Inc." (Pl. Trial Br. 6). No proof of service of the amended third-party complaint on any of the defendants has been filed. The Court assumes that General Carbon is not pursuing its claims against any of the named entities other than the six discussed in its briefs.

3. Activated carbon impregnated with potassium hydroxide is more efficient at adsorbing certain acidic contaminants, including hydrogen sulfide and mercaptans. (Muller Dep. at 78; Stip. Doc. #7, product information sheet).

and liquid potassium hydroxide from outside companies. (Murray Dep. at 15). General Carbon impregnated the activated carbon with potassium hydroxide through a process involving the spraying of a solution of potassium hydroxide and water onto pelletized activated carbon; the mixture is left to dry in open steel drums for approximately two weeks. (Murray Dep. at 15–16). No specific measures are taken to ensure the temperature of the warehouse in which the activated carbon dries; rather, it is kept at ambient temperature, 60 degrees during the day and 50 degrees at night. (Muller Dep. at 15; Murray Dep. at 20, 114).

The aging process, where the activated carbon is left out to dry for two weeks, is important in preventing combustion. (Turk Dep. at 30). The process gives the impregnated activated carbon the opportunity to release heat that is created from the movement of potassium hydroxide into the activated carbon; the release of heat occurs in an environment where there is not oxygen flowing through the carbon that could otherwise cause combustion. (Turk Dep. at 30–33). Two weeks is the industry standard for drying activated carbon (Turk Dep. at 40); General Carbon makes no effort at the end of the two weeks to ascertain moisture content during the process, but rather leaves behind any portion that appears wet. (Muller Dep. at 40, 44).

### 3. *The Shipment*

Beginning in June 2000, Johnson Pacific requested that General Carbon use its "new shipper," Navtrans. (Stip. Doc. # 5, email from Jennifer Tan at Johnson Pacific to Bob Muller, dated June 28, 2000). Upon receipt of Johnson Pacific's request

to use Navtrans, Robert Muller contacted Frank Damaro at Navtrans and provided him information on what was being shipped; Damaro then requested a material safety data sheet, which General Carbon provided. (Muller Dep. at 94–5). Navtrans arranged multiple subsequent shipments of activated carbon to Johnson Pacific, including the ill-fated shipment on March 21, 2001 that is the subject of the instant action.

Navtrans's role in arranging for the March 21, 2001 shipment included overseeing and gathering shipper's documents (*e.g.*, shipper's commercial invoice, packing list) (Damaro Dep. at 10, 15, 42); preparing and issuing two bills of lading (*id.* at 28; Stip. Doc. # # 11, 13); and locating and coordinating with a carrier, Rose Containerline.[4] Navtrans contracted for a shipment with Rose Containerline, which then issued a bill of lading listing Navtrans International as the shipper. (Stip. Doc. # 28, Rose Containerline Bill of Lading). Rose then booked space with carrier Hapag–Lloyd, in two of its slots aboard the M/V Kitano (Ferrer Dep. at 38), and arranged for pick-up of the cargo at General Carbon. (Stip. Doc. # 28, Rose Containerline Booking Confirmation).

The bills of lading Navtrans issued to General Carbon listed the cargo as "activated carbon" and described the shipper's packaging (bags and drums). (Stip.Doc.# # 11, 13). The bills of lading contained various terms and conditions, including an indemnification provision addressing liability where dangerous or hazardous goods were shipped without full disclosure to the Carrier. (Stip.Doc.# 11, ¶ 17). The provision required that where a shipper fails to make such a disclosure,

---

**4.** Although the third-party complaint lists defendant as "Rose Container Line Inc.," documents from Rose indicate the correct name is

Rose Containerline, Inc. (Stip. Doc. # 2, Rose Containerline Booking Confirmation).

the shipper shall indemnify the carrier for its expenses incurred as a result of that omission.

General Carbon repeatedly assured Navtrans that the activated carbon was nonhazardous, and that General Carbon shipped activated carbon all the time as nonhazardous cargo. (Damaro Dep. at 23, 48). General Carbon did not believe that its activated carbon was hazardous, nor that it had any potential to self-combust. (Murray Dep. at 42, 87). General Carbon made no specific requests, and gave Navtrans no special instructions, regarding shipment and handling in overseas transport of impregnated activated carbon (*e.g.,* regarding type of container), nor was General Carbon aware of any special precautions that should have been taken. (Murray Dep. at 116–17). General Carbon did provide a material safety data sheet and a product information sheet instructing end users on dangers and safe handling of impregnated activated carbon. (Muller Dep. at 83; Stip. Doc. # 7).

### 4. *Loading the Shipment*

On March 12, 2001, Rose Containerline arrived at General Carbon to pick up and transport a shipment of impregnated activated carbon. (Stip. Doc. # 11, Bill of Lading). Rose Containerline provided a forty-foot steel container from Hapag–Lloyd, number HLCU437489 ("container 89"), into which General Carbon loaded 360 vinyl bags, each holding forty-four kilograms of activated carbon. (Stip. Doc. # 12, Shipping Order; Stip. Doc. # 13, Bill of Lading). On March 16, 2001, Rose Container Line provided another forty-foot steel Hapag–Lloyd container, number HLCU4224290 ("container 90"), into which General Carbon loaded 288 bags, each holding forty-four kilograms of activated carbon, and fourteen steel drums, each holding 115 kilograms of impregnated acti-

vated carbon. (Stip. Doc. # 9, Shipping Order; Stip. Doc. # 11, Bill of Lading).

General Carbon's regular practice was for either Robert Murray or Alex Maisonet, General Carbon's foreman, to conduct an inspection of the containers before they were loaded. (Murray Dep. at 106; Muller Dep. at 86). Murray does not recall if he supervised the loading of the two shipments at issue here. (Murray Dep. at 27). He assumed that his foreman, Maisonet, inspected every truck or container into which cargo was loaded (Murray Dep. at 54), and would have rejected any piece of equipment if it had any defect. (*Id.* at 54). Neither Murray nor Muller were aware of any defects in the containers. (*Id.* at 107; Muller Dep. at 90–91).

General Carbon loaded the containers on the loading dock, located outside the warehouse. (Murray Dep. at 78). The bags were loaded onto pallets, with twenty bags per pallet, arranged four bags per layer, five layers high, with a cardboard trim sheet between, for a total of twenty bags per pallet. (*Id.* at 29, 39–40). The mouth of the bags was not secured, but rather folded over. (*Id.* at 31–32). The bags were then shrink-wrapped onto the pallet, across the top and around the sides, but not underneath the bottom of the bags or the pallet. (*Id.* at 29–30). The pallets, and steel drums, were loaded into the steel containers, which Rose then transported to the vessel.

### 5. *The Voyage and The Fire*

On or about March 21, 2001, the two containers were loaded aboard the M/V Kitano. Both containers were declared as general cargo. The Kitano's practice was for ship crew to inspect each container. (Iwata Dep. at 271–72). Because the containers at issue were declared as general cargo, no documentation of inspection would have been created. (*Id.*). Container 90 was stored in a slot above deck, while

container 89 was stored below-deck. (Stip. Doc. # 34, Fire Investigators' Preliminary Report).

The vessel departed New York on March 21, 2001, and encountered stormy weather and rough seas. (Iwata Dep. at 201, Ex. 26). On March 22, 2001 at approximately 4:00 p.m., a fire was discovered on board the vessel. (Stip. Doc. # 27, Ship Log). Fire fighting measures were immediately instigated. During the fire-fighting, the ship's crew reported seeing "little red pellets . . . burning" outside container 90. (Iwata Dep. at 270, 272, 285). The fires were extinguished by approximately 11:15 p.m. the following day, March 23, 2001. (Iwata Dep., Ex. 26). In addition to damage sustained by container 90, nearby containers sustained fire damage, including cargo belonging to Scholastic, Inc. (books) and Dover Corporation (machine parts).

The fire started in container 90. The impregnated activated was cargo of a "flammable, . . . unstable or dangerous nature," as those terms are used in the bill of lading between General Carbon and Navtrans.[5] (Stip.Doc.# 11).

### 6. Navtrans's Actions After the Fire

Earlier in the morning of March 23, 2001, Frank Damaro at Navtrans contacted Robert Murray at General Carbon, requesting that Murray put in writing on General Carbon's letterhead that the impregnated activated carbon was "nonhazardous."[6] (Murray Dep. at 121–22; Stip. Doc. # 16, fax coversheet and fax stating "nonhazardous"). Per Damaro's instructions, Murray wrote "non-hazardous" on the commercial invoices for the two containers, and then faxed them to Sue Danders, who apparently worked for Hapag–Lloyd, and to Damaro. (Id.). A few hours later, Damaro faxed the documents to the legal department of North American Van Lines. (Stip. Doc. # 1, fax cover sheet).

### 7. Litigation and Settlement

On April 18, 2002, Scholastic, Inc. and Dover Corporation filed a complaint in this Court for damages sustained during the fire against multiple entities, including the vessel and various carrier entities. The complaint was amended on September 10, 2002 to name General Carbon as a defendant. In August, 2002, a case filed by another shipper, JT International, S.A., was accepted by this Court as related to the Scholastic action. JT International similarly amended its complaint on September 18, 2002, adding General Carbon as

---

**5.** The Court notes that impregnated activated carbon, when shipped in packages not more than three cubic meter volume, is not regulated as a hazardous material under the International Maritime Dangerous Goods Code or Department of Transportation Regulations. (Altemos Dep. at 36–37). The parties do not dispute that the individual packages (bags and drums) in which the activated carbon was shipped were smaller than three cubic meters in volume. (Altemos Dep. at 37; Muller Dep. at 58–59). The Court also notes that the activated carbon here was shipped in forty-four kilogram bags, twenty bags per pallet, with 360 bags in one container and 288 bags and fourteen 115 kilogram drums in the other. (Stip.Doc.# # 9, 12).

**6.** Damaro did not remember when he received the document, but testified that he requested the non-hazardous declaration before the fire, but did not receive it until after, because General Carbon "was slow in sending back [his] request." (Damaro Dep. at 51). The fax transmission date and time information at the top of the document shows that General Carbon faxed the document on March 23, 2001 at 7:51 a.m. I reject Damaro's testimony and find that Damaro did not request the document until March 23, 2001, after the fire had started.

a defendant.[7] On March 4, 2003, General Carbon filed a third-party complaint in each action, the subject of the instant summary trial. On November 14, 2003, Navtrans filed a counter-claim against General Carbon.

Settlement negotiations ensued; as of November 2003, all claims were settled, except for General Carbon's third-party claims against Navtrans and Navtrans's counter-claims against General Carbon.[8] General Carbon paid a total of $1 million to settle the claims against it (Stip. Facts ¶ 1), which was approximately half the total damages claimed against it. (*Id.* ¶¶ 4, 6, 8, 10, 12).

General Carbon now seeks from Navtrans indemnification and contribution for its settlement payments, and damages for its lost goods. Navtrans in turn seeks contractual indemnification for attorneys' fees and costs incurred in this litigation.

### DISCUSSION

The principal issue presented is whether Navtrans is liable to General Carbon, under a theory of indemnification or contribution. The parties agree that the case is controlled by maritime law and the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 *et seq.* General Carbon fails to make clear the precise basis for claiming it is entitled to indemnification and contribution. General Carbon does not rely on any contractual basis, but rather appears to be arguing a negligence theory, based on an expansive reading of Navtrans's obligations as an intermediary. Any liability turns on Navtrans's legal status as either a freight forwarder or a non-vessel operating common carrier ("NVOCC"), in relation to General Carbon and parties with whom General Carbon settled. After setting out the applicable law on the status of intermediaries and their potential liability, I address the merits of General Carbon's claims.

### 1. *Freight Forwarders v. Non–Vessel Operating Common Carriers*

Freight forwarders and non-vessel operating common carriers are types of intermediaries that arrange for shippers the transportation of cargo aboard a vessel. Although they perform similar roles, the legal status of the intermediary determines its liability to the shipper.

A freight forwarder "simply facilitates the movement of cargo to the ocean vessel. The freight forwarder 'secures cargo space ..., gives advice on governmental licensing requirements [and] proper port of exit and letter of credit intricacies, and arranges to have the cargo reach the seaboard in time to meet the designated vessel.'" *Prima U.S. Inc. v. Panalpina, Inc.*, 223 F.3d 126, 129 (2d Cir.2000) (quoting *New York Foreign Freight Forwarders & Brokers Ass'n v. Federal Maritime Comm'n*, 337 F.2d 289, 292 (2d Cir. 1964)); *see also* 46 C.F.R. § 515.2 (listing freight forwarder duties). An "NVOCC," in contrast, does not merely arrange for transportation of goods, but takes on the responsibility of delivering the goods. The most fundamental difference between a freight forwarder and an NVOCC is that an NVOCC issues a bill of lading. *See Prima*, 223 F.3d at 129. It is from the bill

---

**7.** Various cross-claims were also made by some of the defendants.

**8.** The status of General Carbon's third-party complaint against Rose Containerline is unclear: the parties apparently agreed to an "open extension of time to answer." (*See* Letter to the Court from counsel to Rose Containerline, dated November 3, 2003). Rose Containerline has not answered, nor has General Carbon filed default judgment papers; the Court assumes that General Carbon has abandoned its claims against Rose.

of lading—the NVOCC's contract with the shipper—that its liability to the shipper for its cargo derives. *Id.* A freight forwarder, in contrast, is only liable to a shipper "for its own negligence, including negligence in choosing a carrier." *Zima Corp. v. M.V. Roman Pazinski,* 493 F.Supp. 268 (S.D.N.Y.1980); *see also Prima,* 223 F.3d at 130 ("when a freight forwarder selects someone to perform transportation services, that selection fulfills the forwarder's obligations in the absence of proof that the selection itself was negligent").

### 2. *Defendants' Status as Freight Forwarder and/or NVOCC*

General Carbon argues that certain of the Navtrans entities acted as freight forwarders, while others acted as NVOCCs, arguing for liability under either status. Navtrans argues that all its entities functioned as NVOCCs. Neither party submits sufficient evidence to distinguish among the Navtrans entities,[9] and it is not possible to determine from the record the status of each entity. A determination of each entity's status is unnecessary, however, because I find that Navtrans is not liable to General Carbon as either an NVOCC or a freight forwarder.

#### i. *Liability as an NVOCC*

■ Both General Carbon and Navtrans recognize that in this case General Carbon would be strictly liable for damages caused by the fire if it were a shipper of dangerous goods. In *Senator Linie Gmbh & Co., Kg v. Sunway Line, Inc.,* 291 F.3d 145 (2d Cir.2002), the Second Circuit made clear that § 4(6) of COGSA, 46 U.S.C.App.

§ 1304(6), imposes on a shipper of dangerous goods strict liability "for damages resulting directly or indirectly from such shipment when neither the shipper nor the carrier had actual or constructive preshipment knowledge of the danger." *Senator Linie,* 291 F.3d at 168. The impregnated activated carbon—indisputably the instigator of the fire—clearly was "goods of an inflammable, explosive, or dangerous nature." 46 U.S.C.App. § 1304(6). General Carbon maintains, and Navtrans does not dispute, that neither General Carbon nor the ocean carrier had either actual or constructive knowledge of the risk of fire presented by the impregnated activated carbon.

While both parties recognize the relevance of *Senator Linie* and COGSA § 4(6) to General Carbon's liability, both ignore the implications the case has on Navtrans's liability as an NVOCC. *Senator Linie* involved not just a manufacturer/shipper of dangerous goods, but also an NVOCC (Zen Continental Co., Inc.) that arranged for the shipment and issued a bill of lading. *Senator Linie,* 291 F.3d at 149. The district court explicitly found, and the Second Circuit recognized, that "[u]nder COGSA, Zen qualified as a shipper in its capacity as a NVOCC." *Id.* at 150 n. 5 (citing 46 U.S.C.App. § 1702(17)(B) & 21(E)). All shippers, including the NVOCC, were found strictly liable for damages sustained by the fire in that case.

In the same vein, any Navtrans entities that functioned as NVOCCs are considered shippers in their relationship to the ocean common carrier. COGSA explicitly states

---

**9.** General Carbon initially argued that all Navtrans entities, without distinguishing among them or their individual duties, operated as freight forwarders and NVOCCs. Navtrans in turn argued that all Navtrans entities operated as NVOCCs, also making no distinction among its entities. General

Carbon in its reply then "accept[ed] the contention" that two of the Navtans entities, Navtrans Container Lines, Inc. and Sirva Container Lines, Inc., were NVOCCs, maintaining that the remainder were freight forwarders. (*See* Pl.'s Rebuttal/Supplemental Br. at 7).

as much: 46 U.S.C.App. § 1702(17)(B) provides that a "non-vessel-operating common carrier ... is a shipper in its relationship with an ocean common carrier." [10] Therefore, Navtrans may be held strictly liable as a shipper of dangerous goods for damages to the other cargo holders caused by the impregnated activated carbon, for the same reasons General Carbon would be strictly liable to the parties with whom it settled.

Even assuming Navtrans would be liable under *Senator Linie* to the other cargo owners as the "shipper" of dangerous cargo, General Carbon cannot recover from Navtrans for contribution or indemnification because General Carbon would be contractually bound to indemnify Navtrans. In other words, General Carbon cannot seek reimbursement from Navtrans for payments to other carriers because Navtrans would be entitled to reimbursement from General Carbon for any losses or liabilities it sustained. Paragraph seventeen of the bill of lading between General Carbon and Navtrans provides:

> Goods of a flammable, ... hazardous, unstable or dangerous nature, shipped without full disclosure in writing to the Carrier as to their nature and character, may at any time before discharge be landed at any place.... The Shipper shall indemnify the Carrier for all losses, damages, liabilities, civil penalties and expenses (including attorney's fees) suf-

fered by the Carrier, caused in whole or in part by omission of full disclosure required by this paragraph or by applicable regulations.

(Stip. Doc. #11, Bill of Lading).[11] As between General Carbon and Navtrans, General Carbon is the "Shipper" and Navtrans is the "Carrier." The goods at issue clearly were "flammable, ..., unstable or dangerous." Therefore, for this contractual indemnification provision to apply, Navtrans must prove that General Carbon failed to fully disclose in writing the nature and character of the dangerous goods. Based on the record before me, I find that Navtrans has made such a showing.

General Carbon submits that, although it was unaware of the hazardous nature of its impregnated activated carbon, it did provide sufficient information, in writing, fully disclosing the dangerous nature of its goods. Not only is that argument internally inconsistent, but it is not supported by the record. General Carbon asserts that the product information sheet provided to Navtrans "placed Navtrans on actual notice of the very phenomenon that did, in fact, according to the testimony of [the chemical expert], cause the fire." [12] (Pl. Tr. Br. at 29; *see also* Pl. Rebuttal/Supp. Br. at 12 (stating that the document "speaks to spontaneous heating and combustion")). The product information sheet does no such thing.

---

**10.** I also note that, as was the case in *Senator Linie,* Navtrans as NVOCC was listed as the shipper in the Rose Containerline bill of lading. (Stip.Doc.# 28).

**11.** This language closely tracks the language of COGSA § 4(6).

**12.** Dr. Amos Turk, General Carbon's expert witness on activated carbon and occasional chemical consultant for the company (Murray Dep. at 65–66), opined that, assuming the impregnated activated carbon was aged for

two weeks and appropriately dried, and that no other heat sources or foreign matter (*e.g.,* gasoline) were applied to the container, the combustion in container 90 was caused by moisture entering the container. The moisture reacted with the impregnated activated carbon, eventually heating enough to start a fire. (Turk Dep. at 43). Whether the impregnated activated carbon was improperly aged or whether it reacted with moisture is irrelevant, for either way the impregnated activated carbon was unstable and dangerous.

The product information sheet is a document prepared for end-users and people physically handling activated carbon impregnated with potassium hydroxide. (Stip. Doc. # 7, product information sheet; Murray Dep. at 44; Muller Dep. at 83–84). It describes the dangers of activated carbon, including the risk that it can remove oxygen from the air, and should not be confined without operative fans. In addition, the second paragraph of the product information sheet states the following:

> Skin irritation and burns can be caused by direct physical contact with wet GC IPH carbon [activated carbon impregnated with potassium hydroxide]. This can also be caused by the heat of adsorption. If this occurs, flush the affected area with water for at least fifteen minutes. Contact a physician if the irritation persists.

(Stip. Doc. # 7, product information sheet). This statement does not function to fully disclose the dangerous nature of the activated carbon, i.e., it presented a risk of combustion. The "heat of adsorption" merely refers to heat created by the process of molecules adhering to the surface of the activated carbon. Heat is a natural byproduct of this exothermic reaction. In other words, the "heat of adsorption" is a byproduct of what activated carbon is designed to do—remove contaminants by adsorption. This product information sheet merely functions to warn the user that this process may result in enough heat to burn skin. It is a far cry from "speak[ing] to spontaneous heating and combustion." A shipping intermediary cannot be held to have either actual or constructive knowledge of the danger of combustion merely because it was given a product information sheet mentioning the "heat of adsorption." This is especially true given that General Carbon—the manufacturer of the activated carbon—claims it had no actual or constructive knowledge of the danger itself, even though it wrote the very product information sheet it asserts put Navtrans on notice.

In sum, I find that General Carbon did not fully disclose the dangerous nature of its product, and that neither General Carbon as Shipper nor Navtrans as Carrier had knowledge of the dangerous nature of the cargo. Therefore, the contractual indemnity provision applies: General Carbon must indemnify Navtrans for any "losses, damages, liabilities, civil penalties and expenses" suffered as a result of its omission. Because the contract places indemnity liability upon General Carbon in favor of Navtrans, Navtrans as NVOCC has no duty to indemnify General Carbon for its settlement payments.

### ii. *Liability as a Freight Forwarder*

Often when the status of an intermediary as NVOCC or freight forwarder is disputed, the intermediary argues for freight forwarder status and its limited liability, while the plaintiff argues for NVOCC status and increased liability arising from the bill of lading. *See e.g., Prima U.S. Inc. v. Panalpina, Inc.*, 223 F.3d 126 (2d Cir.2000); *Zima Corporation v. M.V. Roman Pazinski*, 493 F.Supp. 268 (S.D.N.Y.1980). Perhaps in recognition of the losing position it faces if all Navtrans entities are NVOCCs, General Carbon crafts a unique argument, asking the Court to vastly expand the standard of liability for freight forwarders.

A freight forwarder's liability to a shipper is limited to liability for negligence in supervising the transport of cargo. 1 Thomas J. Shoenbaum, Admiralty & Mar. Law § 10–7 (4th ed.) (citing *Ingersoll Milling Machine Co. v. M/V Bodena*, 619 F.Supp. 493 (S.D.N.Y.1985)). A freight forwarder does not effect the transportation itself, but rather selects and hires the

companies that perform the tasks of transportation; a freight forwarder will only be held liable, then, for negligence in selecting those who perform the transportation services. *Prima,* 223 F.3d at 130.

General Carbon, however, makes no argument that Navtrans was negligent in its selection of companies that performed the transportation services in this case. Rather, General Carbon instead argues for an expansive notion of the duties of Navtrans as a freight forwarder, which it then argues were performed negligently.

■ First, General Carbon argues that Navtrans "undertook an affirmative obligation to identify any hazard associated with the GC IPH AC [impregnated activated carbon]" (Pl. Tr. Br. at 26), and that Navtrans was negligent "with respect to [its] own procedures" in dealing with hazardous goods. This argument fails: Navtrans took on no such affirmative duty and was not negligent with respect to its procedures in dealing with hazardous goods. Navtrans complied with its procedures, and industry standard, in relying on the manufacturer/shipper to tell Navtrans whether its cargo was nonhazardous. General Carbon repeatedly assured Navtrans that its activated carbon was nonhazardous. The mere fact that Damaro stated that he was concerned about the word "activated"—which "raised red flags" and about which he wanted more information[13] —does not create "an affirmative obligation to identify any hazard" associated

with the cargo, a duty that does not otherwise belong to a freight forwarder.

General Carbon apparently also argues that Navtrans was negligent "with respect to [its] own procedures" because Damaro did not request General Carbon put in writing that its product was not hazardous until after the fire. (Pl. Tr. Br. at 28). First, the record shows that Navtrans's procedure normally was not to ask for such a declaration where a shipper has represented to it that its products are nonhazardous. (*See* Damaro Dep. at 20, 26, 30, 46, 56). As General Carbon's president recognized, immediately after the fire everyone was "in CYA mode" (Muller Dep. at 103), and Damaro likely requested the declaration after the fire out of concern for his own liability, not because it was standard Navtrans procedure. (*See also* Damaro Dep. at 7). Second, General Carbon makes no effort to argue what relevance Damaro's failure to request the document before the fire bears on the issue of negligence, *i.e.,* what impact his request before the fire that General Carbon put in writing its belief as to nonhazardousness would have had on the chain of events.

Second, General Carbon argues that "Navtrans failed to process product information provided by General Carbon." (Pl. Tr. Br. at 28). General Carbon's argument on this point is far from complete, focusing entirely on how its provision of the product information sheet put Navtrans on notice of the danger of fire, while failing to explain in what way Navtrans should have "processed" it.[14] This argu-

---

**13.** Damaro testified that the word "activated" "set off a red flag," that caused him to ask General Carbon for assurance that the activated carbon was nonhazardous. Damaro's concern, at most, reflects his lack of familiarity with General Carbon's product. "Activated" merely refers to the process by which carbon is processed, usually through extremely hot steam, to create openings in the structure of the carbon to allow space for adhesion

of other molecules. (Turk Depo. at 28–29). Damaro's concern does not mean that he took it upon himself to investigate and identify "any hazard associated" with the product, hazards of which General Carbon itself were not aware.

**14.** For example, General Carbon does not seem to argue that Navtrans should have declared the cargo hazardous. In making a

ment is rejected, for, as discussed above, I find that Navtrans was not given sufficient information to put it on notice of the danger of fire presented by the activated carbon.

 Third, General Carbon argues that Navtrans was negligent in "its role in securing a marine container that permitted excess moisture to come into contact with the cargo, causing the fire." (Pl. Rebuttal/Supplemental Tr. Br. at 5). Navtrans's "role" and attendant liability as a freight forwarder in providing the marine container was limited to competently selecting the company that provided the container. *Prima*, 223 F.3d at 130. General Carbon expends much effort, in its brief and expert testimony, arguing that the fire occurred because water entered the container, reacting with the impregnated activated carbon and eventually generating enough heat to cause a fire in the container. (Pl. Tr. Br. 16–18; Turk Dep. *passim*). Nevertheless, General Carbon has not shown, nor makes any effort to show, that Navtrans was negligent as a freight forwarder in its selection of Rose Containerline, which provided the container to General Carbon for loading and transported the loaded container to the vessel. Even if the container were faulty and moisture ingress did cause the fire, an issue I do not reach, Navtrans is not liable as a freight forwarder for its choice of Rose Containerline to provide the physical container.

In sum, Navtrans is not liable to General Carbon for the latter's settlement payments to those parties damaged by the fire.[15] This result is consistent with the Second Circuit's conclusion in *Senator Linie* that "a shipper can be expected to have greater access to and familiarity with goods.... If an unwitting party must suffer, it should be the one that is in a better position to ascertain ahead of time the dangerous nature of the shipped goods." *Senator Linie*, 291 F.3d at 169. Here, General Carbon surely was in a better position than Navtrans to ascertain ahead of time the dangerous nature of its activated carbon.[16]

### 3. *Navtrans's Indemnification Claims*

 Navtrans counter-claims for indemnification by General Carbon of its attorneys' fees and expenses for depositions and expert witnesses. (Amended Counter–Claim ¶ 11). Navtrans argues it is entitled to indemnification under either the contractual indemnity provision of the bill of lading, discussed above, or COGSA § 4(6). The bill of lading provides for indemnity of all "expenses (including attorney's fees) suffered by the Carrier, caused in whole or in part by omission of full disclosure" of the dangerous nature of the cargo. COGSA § 4(6) requires indemnification by a shipper of dangerous goods, without disclosure, of "all damages and expenses directly or indirectly arising out of or resulting from such shipment." 46 U.S.C.App. § 1304(6). Under either the

separate argument elsewhere in its brief, General Carbon does contend that "given Navtrans'[s] actual notice regarding the exothermic reaction of the GC IPH AC [impregnated activated carbon] when allowed to become wet, it should have either (1) caused a condition survey to be performed on the containers to ensure water-tightness ... or (2) specified that both containers be stowed below-deck." (Pl. Tr. Br. at 32). I need not, and do not, reach this argument.

**15.** For the same reasons that I find that Navtrans is not liable to General Carbon for its settlement payments, I reject General Carbon's claim for damages to its own cargo.

**16.** The Court has considered General Carbon's other arguments and they are rejected.

bill of lading or COGSA, Navtrans is entitled to indemnification for attorneys' fees and costs incurred in this litigation over the fire resulting from General Carbon's failure to disclose the dangerous nature of its goods.

### CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Navtrans, dismissing General Carbon's claims for indemnification, contribution, and damages and awarding Navtrans its attorneys' fees and expenses incurred in this litigation. Navtrans shall submit a proposed judgment on notice within five business days hereof, with a supporting affidavit, detailing the requested fees and expenses. Any objections are to be submitted within three business days thereafter.

SO ORDERED.