# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-30975

United States Court of Appeals
Fifth Circuit

**FILED**
August 8, 2017

Lyle W. Cayce
Clerk

GIC SERVICES, L.L.C.,

> Plaintiff - Appellee,

v.

FREIGHTPLUS USA, INCORPORATED,

> Defendant - Third Party Plaintiff - Appellant - Appellee,

INDUSTRIAL MARITIME CARRIERS, L.L.C.,

> Third Party Defendant - Appellant - Appellee.

Appeals from the United States District Court
for the Eastern District of Louisiana

Before ELROD, SOUTHWICK, and GRAVES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

This case is about a tugboat and its voyage across the Atlantic from Houston to Nigeria. Though the tugboat arrived safely in port, the parties dispute whether it was discharged at the correct port. The party that arranged for the tugboat's transport wanted it discharged at Lagos, Nigeria; the ocean carrier believed Warri, Nigeria to be the correct port of discharge, claiming it was told so by an intermediary. Despite the parties' efforts to secure discharge at Lagos, the ocean carrier was unable to do so and continued on to Warri. And

No. 15-30975

there the tugboat remained. Predictably, litigation ensued. After a bench trial, the district court entered judgment, allocating the liabilities and associated damages among the parties. On appeal, the ocean carrier and the intermediary challenge various aspects of the judgment. We AFFIRM in part and REVERSE in part.

## I.

The plaintiff in this case, GIC Services, L.L.C. (GIC), contracted with Freightplus USA, Inc. (Freightplus), the defendant/third-party plaintiff, to arrange for the transport of a tugboat—the REBEL—to Nigeria.[1] Freightplus does not own vessels capable of transporting the REBEL, so Freightplus contracted with Yacht Path International, Inc. (Yacht Path)[2]—a broker specializing in the transportation of large water craft—who in turn contracted with Industrial Maritime Carriers, L.L.C. (IMC) as the "vessel-operating common carrier." In the end, GIC agreed to pay Freightplus $111,000 for its services, Freightplus agreed to pay Yacht Path $85,000, and Yacht Path agreed to pay IMC $70,000. While GIC paid the amount it owed to Freightplus, and Freightplus paid the amount owed to Yacht Path, Yacht Path did not remit the amount owed to IMC.

In the course of making these arrangements, representatives from Yacht Path spoke with representatives of IMC via telephone and communicated information for IMC's bill of lading,[3] including the desired port of discharge. Exactly *what* was communicated by Yacht Path is in dispute: IMC claims that

---

[1] The REBEL is not owned by GIC, but is owned jointly by GIC Oil and Gas Services, Ltd. (the parent company of GIC) and another entity.

[2] Yacht Path is now in bankruptcy and is not a party to this appeal.

[3] A bill of lading "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 94 (2010) (quotation marks omitted).

2

No. 15-30975

Yacht Path said that Warri was the port of discharge, while Freightplus claims that Yacht Path identified Lagos as the port of discharge. IMC then issued a "booking note," which purported to specify the terms of its agreement with Yacht Path. This "booking note," which was sent to Yacht Path, lists Warri as the port of discharge. Yacht Path issued its own booking note and bill of lading, both of which list Lagos as the port of discharge. In late December, Freightplus issued a "house bill of lading," identifying Lagos as the port of discharge. The next day, IMC issued a "non-negotiable" bill of lading and a cargo manifest, both of which listed Warri as the port of discharge.[4] IMC asserts that its non-negotiable bill of lading and cargo manifest were both sent to Yacht Path. At no time prior to the REBEL's departure from Houston did anyone notice or acknowledge the discrepancy as to the port of discharge.

The REBEL departed Houston in late December. In early January, while the REBEL was en route to Nigeria, communications occurred between Mr. Branting of IMC and Mr. Cummings of Yacht Path through which it became clear that there was confusion over the REBEL's port of discharge. In mid-January, representatives from Yacht Path, Freightplus, and GIC attempted to find a way to discharge the REBEL at Lagos. However, the district court found that a late-night e-mail on January 16 from a Yacht Path representative was the first occasion in which "anyone at Yacht Path or IMC discussed the need for changing the REBEL's destination" from Warri to Lagos. Despite efforts to rectify the situation, IMC was unable to discharge the REBEL at Lagos. While various parties blame an inability to contact GIC's agent in Nigeria at the eleventh hour, the district court found that "manifest and customs documents"

---

[4] This bill of lading was not a final bill of lading. It is marked "non-negotiable," and so it could not have been used to claim the cargo at the port of discharge.

3

No. 15-30975

listing Warri as the port of discharge also contributed to IMC's inability to discharge the REBEL at Lagos.

The ocean carrier proceeded on to Warri and discharged the REBEL there. Though GIC initially sought to obtain the REBEL's release, it was informed that the REBEL could not be released because IMC had not been paid its freight. And so, the REBEL remained in Warri in the custody of a company called Julius Berger.

GIC sued Freightplus, and Freightplus in turn brought a third-party action against IMC. IMC counter-claimed against Freightplus and the REBEL *in rem* to recover its unpaid freight. After a two-day bench trial, the district court concluded that Freightplus was liable to GIC for $1,860,985 in damages incurred as a result of the REBEL's discharge in Warri. The district court then determined that IMC was 30 percent at fault for GIC's damages and so the court required IMC to pay 30 percent of the judgment, as well as 30 percent of Freightplus's attorneys' fees. Finally, the district court concluded that IMC was entitled to recover $70,309.12, plus pre-judgment interest, from Freightplus—the amount of IMC's unpaid freight. The district court subsequently amended its judgment to remove IMC's obligation to pay 30 percent of Freightplus's attorneys' fees.[5] Freightplus and IMC both timely appealed.

After briefing in this court was completed, Freightplus filed a "Motion for Partial Dismissal of Appeal." In this motion, Freightplus represented that it and GIC have "reached a settlement" as to that part of the Second Amended Judgment "relat[ing] to GIC Services and Freightplus." Freightplus thus

---

[5] This was the second time the district court amended its judgment. On the first occasion, the district court did so to substitute the fixed-dollar amounts of pre-judgment interest in the original judgment with percentage figures. The Second Amended Judgment also adjusted the amount Freightplus owed to GIC to $1,811,385, plus pre-judgment interest.

4

No. 15-30975

requested that we allow it to "dismiss its appeal." A few days later, GIC filed a "Notice of Satisfaction of Judgment" in the district court, indicating that "GIC and Freightplus entered into a settlement agreement, resolving all claims between them," that "Freightplus has fulfilled the terms of the settlement agreement" and so "[t]he judgment [ ] in favor of GIC and against Freightplus is satisfied[.]" We granted Freightplus's motion and dismissed its appeal "as to those aspects of the Second Amended Judgment in favor of GIC Services, L.L.C. and against Freightplus USA, Incorporated ONLY."[6]

## II.

The parties raise a host of challenges to the judgment. IMC challenges: (1) the requirement that it indemnify Freightplus for a portion of the damages award; (2) the amount of damages awarded GIC; (3) the allocation of damages between itself and Freightplus; and (4) the determination that it may not exercise a lien against the REBEL *in rem* to recover its unpaid freight. Like IMC, Freightplus objects to the allocation of damages between itself and IMC. It also challenges the district court's refusal to award it attorneys' fees and the requirement that it reimburse IMC for its unpaid freight.[7] We address each of these in turn.

---

[6] This dismissal includes Freightplus's argument regarding whether the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.* limits Freightplus's liability to $500—along with the attendant issue of unreasonable deviation. Likewise, the issue of Freightplus's liability to GIC, including the underlying finding that Freightplus is liable to GIC based on a theory of estoppel, is no longer in this appeal.

[7] In its brief, Freightplus argues that GIC lacks standing to recover damages because GIC is not the real party in interest under Federal Rule of Civil Procedure 17(a)(1). IMC did not develop this argument in its own briefing, and it cannot prevail on this argument in any event as there is no indication it ever voiced this objection. *See* Fed. R. Civ. P. 17 (a)(3) ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action."); *see In re Signal Int'l, LLC,* 579 F.3d 478, 487–88 (5th Cir. 2009).

5

No. 15-30975

## A.

We first consider whether IMC is liable to Freightplus under a theory of tort indemnification for a portion of the judgment awarded to GIC.

Once a prominent feature of maritime law, maritime tort indemnification is now available only in limited situations. *Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 833 (5th Cir. 1992). One of these situations arises from a "special relationship" between two entities. *Cities Serv. Co. v. Lee-Vac, Ltd.*, 761 F.2d 238, 240 (5th Cir. 1985) (citing *Fed. Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404 (1969)); *see also LCI Shipholdings, Inc. v. Muller Weingarten AG*, 153 F. App'x 929, 931 (5th Cir. 2005). Under this theory, an entity will owe indemnity when its negligence is the cause of a loss to its counterpart.

The parties agree with the district court[8] that a "special relationship" exists between a "non-vessel operating common carrier" (NVOCC)[9] and a "vessel-operating common carrier" (VOCC).[10] They disagree, however, with the district court's conclusion that: (1) Freightplus was operating as an NVOCC; and (2) IMC was negligent and its negligence caused Freightplus's injury.

While we are not aware of a decision of ours recognizing maritime tort liability based on the relationship between a NVOCC and a VOCC, two of our sister circuits appear to have done so. *See SPM Corp. v. M/V Ming Moon*, 22

---

[8] In denying IMC's motion to dismiss, the district court also decided that Freightplus was entitled to indemnity based on a separate theory—one dependent on the "difference in character of duty owed to GIC." Neither party, however, mentions this latter theory in their briefs, and it is not mentioned in the district court's order either.

[9] A "non-vessel-operating common carrier" is "a common carrier that—(A) does not operate the vessels by which the ocean transportation is provided; and (B) is a shipper in its relationship with an ocean common carrier." *See* 46 U.S.C. § 40102(16).

[10] A "vessel-operating common carrier" is an ocean common carrier. 46 U.S.C. § 40102(17). A common carrier operates the vessel carrying the cargo. See 46 U.S.C. § 40102(6).

No. 15-30975

F.3d 523, 526–27 (3d Cir. 1994); *Ins. Co. of N. Am. v. M/V Ocean Lynx*, 901 F.2d 934, 937, 941 (11th Cir. 1990). Seeing no reason to depart from these decisions, and given the parties' agreement on this question, we conclude that the NVOCC/VOCC relationship may give rise to a claim for maritime tort indemnity to the extent articulated in this opinion.

**1.**

The first question is whether Freightplus was operating as an NVOCC. "Non-vessel operating common carrier" is a term defined by statute. *See* 46 U.S.C. § 40102(16). As such, we review the interpretation of that term *de novo*. *See AEL Asia Express (H.K.) Ltd. v. Am. Bankers Ins. Co. of Fla.*, 5 F. App'x 106, 107 (4th Cir. 2001). To the extent this question involves factual issues, "[m]ixed questions of law and fact are also reviewed *de novo*." *Trinity Indus., Inc. v. United States*, 757 F.3d 400, 407 (5th Cir. 2014); *see also Prima U.S. Inc. v. Panalpina, Inc.*, 223 F.3d 126, 129 (2d Cir. 2000) (reviewing *de novo* whether party was an ocean freight forwarder as a mixed question of law and fact).

In the modern shipping industry, the shipment of goods by vessel from the United States often involves a chain of multiple entities, each with defined roles. One of these is the "non-vessel operating common carrier." NVOCCs operate as intermediaries between the shipper—the entity "seek[ing] to export cargo"—and the ocean common carrier—the entity that "physically carr[ies] the cargo on [its] vessel[ ]." *Landstar Exp. Am., Inc. v. Fed. Maritime Comm'n*, 569 F.3d 493, 494 (D.C. Cir. 2009). Under the Shipping Act of 1984, 46 U.S.C. § 40101 *et seq.*, an NVOCC is defined as "a common carrier that (A) does not operate the vessels by which the ocean transportation is provided; and (B) is a shipper in its relationship with an ocean common carrier." 46 U.S.C. § 40102(16). Typically, the NVOCC's role is to "consolidate cargo from numerous shippers into larger groups for shipment by an ocean carrier." *Prima*, 223 F.3d at 129; *see also Ins. Co. of N. Am. v. S/S Am. Argosy*, 732 F.2d

299, 300–01 (2d Cir. 1984); *All Pac. Trading, Inc. v. Vessel M/V Hanjin Yosu*, 7 F.3d 1427, 1429–30 (9th Cir. 1993).

An NVOCC is therefore something of a hybrid: it is a common carrier[11] vis-à-vis the shipper, but it is itself a shipper vis-à-vis the ocean common carrier. *Ins. Co. of N. Am.*, 732 F.2d at 301; *All Pac. Trading*, 7 F.3d at 1429–30. In its role as common carrier, an NVOCC issues a bill of lading to each shipper, which memorializes the terms of their agreement. *Prima*, 223 F.3d at 129; *see also Landstar*, 569 F.3d at 495. Because of an NVOCC's role as a common carrier and the issuance of a bill of lading, the NVOCC is liable to the shipper if "anything happens to the [cargo] during the voyage." *Prima*, 223 F.3d at 129; *see also Landstar*, 569 F.3d at 495. Further, in its role as a shipper, an NVOCC receives a bill of lading from each VOCC. *Landstar*, 569 F.3d at 495; *All Pac.*, 7 F.3d at 1430. Typically, "NVOCCs receive compensation only from the shipper." *Landstar*, 569 F.3d at 495; *see also Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 883 F.2d 93, 101 (D.C. Cir. 1989) ("The NVOCC is compensated only by the shipper.").

---

[11] Common Carrier means:

"a person that—(i) holds itself out to the general public to provide transportation by water of passengers or cargo between the United States and a foreign country for compensation; (ii) assumes responsibility for the transportation from the port or point of receipt to the port or point of destination; and (iii) uses, for all or part of that transportation, a vessel operating on the high seas or the Great Lakes between a port in the United States and a port in a foreign country; but (B) does not include a carrier engaged in ocean transportation by ferry boat, ocean tramp, or chemical parcel-tanker, or by vessel when primarily engaged in the carriage of perishable agricultural commodities—(i) if the carrier and the owner of those commodities are wholly-owned, directly or indirectly, by a person primarily engaged in the marketing and distribution of those commodities; and (ii) only with respect to the carriage of those commodities.

46 U.S.C. § 40102(6).

No. 15-30975

The parties dispute whether Freightplus was operating as an NVOCC. Yet while both parties discuss the statutory definition of an NVOCC, neither party addresses the statutory definition of the term "shipper," which appears within the definition of NVOCC. *See* 46 U.S.C. § 40102(16) (NVOCC is a "*shipper* in its relationship with an ocean common carrier" (emphasis added)); *id.* § 40102(22) (defining "shipper"). Because the parties have not disputed whether Freightplus falls within the definition of "shipper," we do not reach this issue and instead decide whether Freightplus is an NVOCC based on the arguments presented to us.

We conclude that Freightplus qualifies as an NVOCC because it shares those characteristics typically associated with an NVOCC. First, Freightplus issued a bill of lading, which listed Freightplus as the "carrier"—the role an NVOCC plays vis-à-vis the ultimate shipper. *Cf. Prima*, 223 F.3d at 129 (NVOCC issues bill of lading to each shipper); *Landstar*, 569 F.3d at 495 (same). Second, the parties agree that Freightplus was paid exclusively by GIC, also an indicator that Freightplus was acting as an NVOCC.[12] *See Landstar*, 569 F.3d at 495; *Nat'l Customs Brokers*, 883 F.2d at 101.

IMC argues that Freightplus was not operating as an NVOCC because it is not a "shipper" vis-à-vis IMC as required by Section 40102. *See* 46 U.S.C. § 40102(16). It asserts two bases for this argument: First, it argues that Freightplus is not a "shipper" because it is "not listed as a shipper on IMC's booking note, IMC's bill[ ] of lading, or [its] cargo manifest." Second, and relatedly, it argues that Freightplus cannot be considered an NVOCC because it did not "receive a bill of lading" from IMC, the VOCC.

---

[12] There is no dispute that Freightplus is licensed to operate as an NVOCC, but it is also licensed as a "freight forwarder."

9

No. 15-30975

To begin with, the validity of these arguments depends in large part on whether Freightplus was a "shipper" within the meaning of Section 40102(22)—which, as noted, IMC has not addressed in its brief. Moreover, while it is true that Freightplus is not listed as "shipper" on the relevant documents and that it did not receive a bill of lading from IMC, an entity's status as an NVOCC (and as a shipper) depends on its function, not the labels ascribed to it by third parties. *See AEL Asia*, 5 F. App'x at 111 ("When dealing with NVOCCs, an intermediary's *conduct*, and not what it [is] label[ed], will be determinative of its status." (emphasis added) (quotation marks omitted)); *see* 46 U.S.C. § 40102(16), (22) (definitions of "shipper" and NVOCC). And here, it is clear that Freightplus possesses the characteristics typical of an NVOCC.

IMC argues that Freightplus was "at most a freight forwarder." But an examination of the services typically performed by a freight forwarder undermines, rather than strengthens, IMC's argument. Unlike an NVOCC, a freight forwarder (1) does not issue a bill of lading, *Prima*, 223 F.3d at 129; and (2) "receives compensation for its services both from its customer . . . and from the ocean carrier." *Nat'l Customs Brokers*, 883 F.2d at 95; *Landstar*, 569 F.3d at 495. Neither is true of Freightplus. That Freightplus's conduct differs from that typical of a VOCC confirms our conclusion that it operated as an NVOCC.

**2.**

We next address the validity of the district court's finding that IMC acted negligently.  In the maritime context, as in any other, "[q]uestion[s] of fault, including determinations of negligence and causation, are factual issues, and may not be set aside on appeal unless clearly erroneous." *In re Omega Protein, Inc.*, 548 F.3d 361, 367 (5th Cir. 2008) (citing *In re Mid-South Towing*, 418 F.3d 526, 531 (5th Cir. 2005)). Where the "district court's account of the evidence is plausible in light of the record viewed in its entirety," we will "not reverse . . . even though convinced that had [we] been sitting as the trier of fact, [we] would

have weighed the evidence differently." *Id.* In this context, "'[f]indings based on the credibility of witnesses demand even greater deference.'" *Id.* (quoting *Tokio Marine & Fire Ins. Co., Ltd. v. FLORA MV*, 235 F.3d 963, 970 (5th Cir. 2001)).

To establish maritime negligence, "a plaintiff must 'demonstrate that there was [1] a duty owed by the defendant to the plaintiff, [2] breach of that duty, [3] injury sustained by the plaintiff, and [4] a causal connection between the defendant's conduct and the plaintiff's injury.'" *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (quoting *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991) (alteration omitted)). The district court concluded that IMC was negligent because its agent (Intermarine) had notice that Lagos was the correct port of discharge for two weeks before the REBEL arrived there but did not "take steps to ensure proper delivery at Lagos."[13]

IMC raises a single objection to the finding of negligence. Specifically, IMC argues that it was contractually bound to deliver the REBEL to Warri, and so it cannot be found negligent for delivering cargo to the contractually agreed-upon port. Imposing liability under these circumstances, IMC argues, would place it in a cross-current between: (1) complying with its contractual obligations, but then facing tort-indemnity liability for refusing to change the port of discharge; or (2) avoiding tort-indemnity liability by changing the port of discharge, but then facing breach-of-contract liability for doing so.

This argument, however, sails right into the headwinds of the district court's findings. Despite IMC's repeated insistence to the contrary, the district court *did* find that IMC erroneously listed Warri as the port of discharge on its various documents. In its opinion, the district court noted IMC's argument that

---

[13] The district court also faulted IMC for its "lack of due care" in failing to preserve the shipping instructions it received from Yacht Path.

"it was told by Yacht Path that the REBEL's final destination was Warri and therefore fully performed its contractual duties."[14] But the district court concluded that "this argument *is unsupported*," and that IMC had "mistakenly record[ed] the REBEL's port of discharge as Warri," based on the fact that IMC did not produce any evidence that Yacht Path informed IMC that Warri was to be the port of discharge.

We cannot overturn this determination absent clear error. IMC admits that it is unable to produce any documentation showing that Yacht Path identified Warri as the port of discharge. It contends, however, that "there is ample evidence in the record to prove that IMC followed its instructions when it designated Warri as the discharge port." IMC points to the testimony of Mr. Branting and Mr. Jackson, whose testimonies support IMC's account. IMC also points to the fact that its bill of lading, cargo manifest, and booking note identify Warri as the port of discharge, and to an e-mail from Mr. Cummings at Yacht Path, which indicates that "[t]he small tug"—presumably the REBEL—"is booked with my client *at Warri.*"

But the record also contains evidence pointing the other way. For example, the deposition of Mr. Cummings—IMC's point of contact at Yacht Path—was introduced at trial, and he testified to identifying Lagos as the port of discharge in his communications with IMC. We owe particular deference where "credibility of witnesses" is at issue. *See Omega Protein*, 548 F.3d at 367. Moreover, while the designation of Warri on IMC's documents and the e-mail from Mr. Cummings is evidence—perhaps even strong evidence—that Yacht Path did identify Warri as the port of discharge, there is evidence cutting the

---

[14] This statement is found in the district court's "Conclusions of Law," rather than its "Findings of Fact." However, as the district court's opinion notes: "To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such."

other way, including the Yacht Path booking note—issued five days before Mr. Cummings's e-mail—which designates Lagos as the port of discharge. The existence of conflicting evidence is precisely the context in which we defer to the district court's factual findings. *See id.* (we will not reverse factual findings "even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently").

It follows from this conclusion that IMC's objection to the district court's negligence finding must be rejected. Simply put, if IMC did not contract to deliver the REBEL to Warri, then holding IMC liable for doing so does not place it in the catch-22 it posits.[15] IMC offers no other objection to the district court's finding.

Accordingly, because the district court correctly determined that Freightplus was operating as an NVOCC and because its conclusion that IMC was negligent is not clearly erroneous, we uphold its determination that IMC is liable to Freightplus.[16]

## B.

We next address the amount of damages awarded. The district court determined that Freightplus was liable to GIC in the amount of $1,811,385.

---

[15] We note that IMC would not likely have found itself in such a dilemma if it had discharged the REBEL at Lagos. After all, all parties were striving to secure the REBEL's discharge at Lagos once the error was discovered.

[16] Freightplus argues alternatively that it is entitled to full indemnity because IMC was "actively" negligent, while it was, at most, "passively" negligent. This argument is foreclosed by our precedent, which has long since dispensed with the active/passive negligence distinction. *See Loose v. Offshore Nav., Inc.*, 670 F.2d 493, 500–02 (5th Cir. 1982) ("[T]he concepts of active and passive negligence have no place in a liability system that considers the facts of each case and assesses and apportions damages among joint tortfeasors according to the degree of responsibility of each party."); *Seal Offshore, Inc. v. Am. Standard, Inc.*, 736 F.2d 1078, 1082 (5th Cir. 1984) ("The concept of active and passive negligence is of no aid . . . because as a footing for [implying] indemnification it is at best a redundancy within a system of comparative fault."); *Hardy*, 949 F.2d at 834 n.13 ("The Court [has] abandoned the active/passive distinction . . . .").

No. 15-30975

IMC argues that the district court erred in calculating these damages in two respects: First, it objects to the district court's reliance on a particular trial exhibit. Second, it argues that the district court did not account for GIC's failure to mitigate its damages.

We "review[ ] challenges to evidence admitted or excluded for abuse of discretion." *EMJ Corp. v. Hudson Specialty Ins. Co.*, 833 F.3d 544, 551 (5th Cir. 2016). We will reverse only if "the abuse of . . . discretion is *clearly* shown from the record," *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 430 (5th Cir. 2014), *as revised* (Sept. 2, 2014), and "if substantial prejudice resulted from the error," *EMJ Corp.*, 833 F.3d at 551 (quotation marks omitted). "Resolution of preliminary factual questions concerning the admissibility of evidence are reviewed for clear error." *Meadaa v. K.A.P. Enters., L.L.C.*, 756 F.3d 875, 880 (5th Cir. 2014). Further, we review the district court's determination of damages under a clearly erroneous standard. *Fed. Sav. & Loan Ins. Corp. v. Tex. Real Estate Counselors, Inc.*, 955 F.2d 261, 268 (5th Cir. 1992); *see also Neal v. United States*, 562 F.2d 338, 341 (5th Cir. 1977). This deferential standard of review extends to determining whether a party failed to mitigate its damages. *Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585, 592 (5th Cir. 1986). "The burden rests with the wrongdoer to show that the victim of tortious conduct failed to mitigate damages" by demonstrating "(1) that the injured party's conduct after the accident was unreasonable and (2) that the unreasonable conduct had the consequence of aggravating the harm." *Id.*

## 1.

For the bulk of the damages awarded, the district court relied solely on Trial Exhibit 101—an invoice sent from Visfi Nigeria Ltd. to GIC Oil and Gas Services Ltd., detailing the costs for "storing, securing, and releasing the REBEL in Warri." IMC argues that the district court was wrong to do so

14

No. 15-30975

because: (1) the invoice was never authenticated and so it was never properly admitted into evidence; and (2) it is not the "best evidence" of damages. By contrast, the district court found that IMC stipulated to the authentication of Exhibit 101.

Prior to trial, IMC objected to the admission of Exhibit 101 "under Federal Rule of Evidence 901 and 902 because it has not been properly authenticated." The district court deferred on this objection because "[Exhibit 101] [could] be authenticated at trial by witness testimony." At the same time, and as was enshrined in the final pre-trial order, GIC indicated that it intended to call "[a]ny witness needed to authenticate any documents that cannot be agreed to by stipulation."

At trial, GIC sought to introduce the testimony of Mr. Godwin Ebolo, the director of GIC Oil and Gas Services, as an authenticating witness. Though initially objecting, both Freightplus and IMC agreed to stipulate "[t]o the extent [Mr. Ebolo was called] specifically for a Rule 901 authentication . . . ." The relevant colloquy went as follows:

> MR. BOONE [GIC counsel]: Your Honor, I'd like to call Mr. Godwin Ebolo as my authentication federal witness.
>
> MR. WALTERS [Freightplus counsel]: Your Honor, we would object to this witness testifying. He was not listed in the pretrial order. *To the extent that he's called specifically for a Rule 901 authentication, we will stipulate*, and I think - -
>
> MR. WAGUESPACK [IMC counsel]: *We'll stipulate as well, Your Honor.*
>
> MR. BOONE: All right. And that's all he was going to testify to, nothing substantive, just to authenticate those documents that Freightplus and IMC both objected to, which are the three contracts and the agency agreement.
>
> THE COURT: All right. So do we have a stipulation?
>
> MR. WALTERS: Yes. As far as Freightplus, yes.
>
> MR. WAGUESPACK: As far as IMC as well.

15

No. 15-30975

THE COURT: Okay. Well, sir, you can go home. Oh, you still want to call him?

MR. WALTERS: He's been excused.

MR. BOONE: Oh, wait.

MR. WALTERS: We stipulated to authentication. There's no - - if that's the only purpose he would be testifying.

MR BOONE: Yeah. He's testifying for authentication.

MR. WALTERS: We've stipulated to authentication.

MR. BOONE: Oh, you have?

MR. WALTERS: Yes.

IMC contends that its counsel was not stipulating to the authentication of Exhibit 101 since GIC's counsel specifically limited the stipulation to "the three contracts and the agency agreement." However, as the district court found in denying IMC's Rule 59 motion on this issue, the qualifying language from GIC's counsel came *after* counsel for both Freightplus and IMC had "proffered a blanket Rule 901 authentication stipulation for Godwin Ebolo's testimony." Moreover, neither Freightplus's nor IMC's counsel attempted to limit the scope of their unqualified statements agreeing to a stipulation or to confirm that they intended their stipulation to be limited to the particular documents mentioned by GIC's counsel.

We recognize, as did the district court, that "each side could have been more exact in what they were attempting to convey," and that it is possible that Freightplus and IMC did not intend to offer a blanket stipulation on authentication. At the same time, our role is not to determine how we might have come out on this issue in the first instance. *See United States v. Mata*, 624 F.3d 170, 173 (5th Cir. 2010), *as revised* (Nov. 15, 2010) ("A court of appeals may not reverse a district court's finding of fact based only on its belief that, had it been sitting as the trier of fact, it would have weighed the evidence differently and reached a different conclusion."). Instead, we can only reverse

16

the district court's finding if "viewing the evidence in its entirety, [we are] left with the *definite and firm conviction* that a mistake has been committed." *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258–59 (5th Cir. 2006) (emphasis added). As is the case here, "[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *O'Malley v. U.S. Fid. & Guar. Co.*, 776 F.2d 494, 497 (5th Cir. 1985) (quoting *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949)). Accordingly, we hold that the district court did not clearly err in finding that Freightplus and IMC offered a blanket stipulation on authentication.[17]

IMC claims that, even if Exhibit 101 was properly admitted, the damages award is still clearly erroneous because other evidence in the record—namely, a "provisional" invoice from Julius Berger (the company holding the REBEL in Warri)—is much stronger evidence of "the actual amount of storage fees that must be paid in order to obtain the release of the REBEL . . . ."[18] That invoice calculates total charges at $151,169.08, while Exhibit 101 calculates them at $1,460,200.

We disagree. By arguing that the district court should have given greater weight to Exhibit 117 than to Exhibit 101, IMC is effectively asking us to

---

[17] In any event, we conclude that the district court did not abuse its discretion in relying on Exhibit 101 even if there was not a blanket stipulation as to authenticity. After the May 12 colloquy, the parties agreed that GIC's authenticating witness was excused; he was no longer available to testify regarding authenticity. Moreover, the record appears to show that, as a factual matter, Exhibit 101 was admitted into evidence and was in the district court's possession after trial. Accordingly, given that GIC's authenticating witness was no longer available and that Exhibit 101 appears to have been in evidence, we conclude that the district court did not abuse its discretion in relying on Exhibit 101, regardless of whether Freightplus or IMC offered a blanket stipulation on authenticity.

[18] IMC also argues that newly discovered evidence that it presented after trial supports its argument. This "new evidence" was presented to the district court in a Rule 60(b) motion, and the district court denied that motion, concluding that IMC had not met the stringent requirements for Rule 60(b) relief. IMC has not argued to us that the district court's Rule 60(b) ruling is incorrect, and so we will not consider IMC's new evidence.

reweigh the evidence. Again, we will not reverse the district court's factual findings "even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *Omega Protein*, 548 F.3d at 367.

**2.**

IMC next argues that the district court did not account for GIC's alleged failure to mitigate its damages. IMC argues that this mitigation could have occurred if GIC would have "post[ed] a bond as security for IMC's freight claim in order to obtain release of the REBEL from storage."

The district court had before it testimony from Ms. Sogie Ebolo—the managing director of GIC—who testified that she made an effort to secure a bond for the REBEL but was unable to do so because she was told by her attorney that IMC would not accept a bond issued from Nigeria and because bond companies in the United States would not issue a bond for property located in foreign territory. IMC counters with Mr. Jackson's (IMC's corporate representative) testimony "that IMC was never asked about the possibility of accepting a Nigerian bond." At most, then, IMC has shown merely that there is conflicting testimony on this issue. But where "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," and "[f]indings based on the credibility of witnesses demand even greater deference." *Omega Protein*, 548 F.3d at 367 (quotation marks omitted).

**C.**

We now address the district court's allocation of the damages between Freightplus and IMC. The judgment requires IMC to reimburse Freightplus for 30 percent of the damages award. Both Freightplus and IMC challenge this determination. Freightplus contends that because it was entitled to indemnity, the district court should have required IMC to reimburse it for 100 percent of

the judgment.[19] For its part, IMC claims that because Freightplus is a majority at fault, it is not entitled to any recovery.

## 1.

Ever since the Supreme Court's decision in *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975), we have steadily cabined the availability of tort indemnity and "eliminated virtually every variety of tort indemnity once available under maritime law." *Hardy*, 949 F.2d at 833 ("This Circuit recognized . . . that comparative fault displaces the traditional concept of tort [indemnity]."). In its place, we have adopted a "comparative fault" system where "damages in most cases should be allocated according to the respective fault of the liable tortfeasors." *Id.* ("A comparative fault system . . . apportions fault among joint tortfeasors in accordance with a precise determination, not merely equal or all-or-none." (quoting *Loose*, 670 F.2d at 501)). Full indemnity is now reserved for those circumstances "where proportionate degrees of fault cannot be measured and determined on a rational basis," or where the party claiming indemnity is one "on which the law imposes responsibility even though [it] committed no negligent acts"—*i.e.*, was not at fault. *Id.*

Our cases have consistently held that partial fault is incompatible with full indemnity. In *Seal Offshore*, we reviewed a decision in which a third-party defendant was required to pay full indemnification based on an "implied indemnity theory" in maritime law, even though both parties were found at fault. 736 F.2d at 1080, 1082. Recognizing that our precedent "establish[ed]

---

[19] Freightplus argues in the alternative that the district court erred in concluding that it was negligent. While the district court did not find Freightplus "negligent" *per se*, it did find that the limitation of liability in the Carriage of Goods by Sea Act, 46 U.S.C. § 1300, *et seq.*, did not apply because Freightplus had effected an unreasonable deviation. The validity of that issue, however, is not before us. As noted, this court previously entered an order "dismiss[ing] . . . those aspects of the Second Amended Judgment in favor of [GIC] and against [Freightplus] ONLY." The unreasonable deviation issue was the basis for the judgment against Freightplus and in GIC's favor.

that comparative fault principles apply in maritime cases involving both negligence and strict liability," we reversed the award of full indemnity because damages "must be apportioned according to the relative fault" of the defendant and third-party defendant. *Id.* at 1082. Likewise, in *Loose*, we reversed an award of full indemnification where, as in *Seal Offshore*, the indemnitee was found partially at fault. *See Loose*, 670 F.2d at 500–02 (reversing indemnitee award and instructing district court to "instruct the jury to assess the relative degree of responsibility of each party for the plaintiff's injuries"); *cf. Marathon Pipe Line Co. v. Drilling Rig ROWAN/ODESSA*, 761 F.2d 229, 236 (5th Cir. 1985) (upholding award of full indemnity where the "[a]ctual fault" rested with the indemnitor and so the indemnitor "may, therefore, seek full indemnity").

Our decision in *Sea-Land Service, Inc. v. Crescent Towing & Salvage Co.*, 42 F.3d 960 (5th Cir. 1995) is also informative. There, a defendant sued a third-party defendant "for indemnification" for a judgment against it. *Id.* at 962. The district court concluded that both were partially at fault and assessed damages accordingly, but also awarded attorneys' fees to the defendant. *Id.* The parties disputed the availability of the attorneys' fees award, with the outcome turning on whether the award was based on a theory of indemnity (where attorneys' fees may be awarded) or contribution (where they may not). *Id.* at 963. We held that "[the defendant's] partial fault preclude[d] full indemnification," and so it was "entitled to contribution (or partial indemnity) . . . and no more." *Id.* ("Indemnification was not awarded and [would not be] appropriate in th[e] case because both [parties] were found to be at fault.").[20] On this basis, we disallowed attorneys' fees. *Id.*

---

[20] Scholarly sources also agree that "[t]ort indemnity is . . . limited to cases where a non-negligent or vicariously liable tortfeasor is entitled to indemnity from a person who is guilty of actual fault." 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5-19, at 340

No. 15-30975

These precedents scuttle Freightplus's claim for full indemnity. Freightplus was undeniably found to be partially at fault, and that decision is no longer being challenged by Freightplus. Moreover, while both parties contest the district court's findings of fault, neither party has suggested that the "proportionate degrees of fault" in this case "cannot be measured and determined on a rational basis." *Hardy*, 949 F.2d at 833. Under our case law, Freightplus may not recover full indemnity from IMC, but may (at most) recover partial indemnity.

**2.**

Just as we reject Freightplus's argument for full indemnity, we also reject IMC's argument that Freightplus is barred from even *partial* indemnity because it was found to be a majority at fault.[21] In essence, IMC is urging us to adopt a modified comparative fault rule, where damages are divvied out proportionate to fault *except* where the party claiming indemnification is more than 50 percent at fault.

We reject this argument for the same reasons just discussed. While our cases have precluded *full* indemnity where the party seeking indemnification is partially at fault, we have consistently permitted partially at-fault parties to obtain partial recovery proportionate to the fault of the other parties. *See Loose*, 670 F.2d at 495, 501–02; *Seal Offshore*, 736 F.2d at 1082. Thus, while a partially at-fault indemnitee is not entitled to full indemnification, it may be "entitled to a contribution (*or partial indemnity*)." *Sea-Land*, 42 F.3d at 963

---

(5th ed. 2011); *see also* 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 10-39, at 177 (3d ed. 2001) ("Indemnity is properly allowed only when the one seeking indemnity is not guilty of any fault or breach of duty."); 2 *Benedict on Admiralty* 1-67–71 (Matthew Bender 2013).

[21] In its third-party complaint, Freightplus specified that it was seeking contribution from IMC. Though its later pleadings focus on the indemnity issue, Freightplus still indicated that it was seeking contribution.

No. 15-30975

(emphasis added). We are not aware of any authority (and IMC has cited none) indicating that the comparative fault approach we have adopted does not apply when the party seeking indemnity was more at fault than the indemnifying party. To the contrary, the "comparative fault system . . . apportions fault among joint tortfeasors in accordance with a *precise determination*, not merely equally or all-or-none." *Hardy*, 949 F.2d at 833 (emphasis added). We see no basis for charting a new course here.

The district court assigned 70 percent of the fault to Freightplus and 30 percent to IMC, and neither party has challenged the specific percentages chosen. We therefore uphold the district court's requirement that IMC indemnify Freightplus for 30 percent of the judgment in GIC's favor.

**D.**

Under the original judgment, the district court required IMC to pay 30 percent of Freightplus's attorneys' fees. However, in response to IMC's Rule 59 motion, the district court amended its judgment to exclude this liability. Freightplus has appealed the district court's exclusion of the attorneys' fees award. The availability of attorneys' fees—as opposed to the amount awarded—is a question of law that we review *de novo. See Hester v. Graham, Bright & Smith, P.C.*, 289 F. App'x 35, 44 (5th Cir. 2008) ("Because the issue of which party is entitled to attorneys' fees is a legal issue, this court reviews this award of attorneys' fees *de novo.*"); *see also Sea-Land*, 42 F.3d at 963 (reviewing availability of attorneys' fees without deference).

In *Odd Bergs Tankrederi A/S v. S/T Gulfspray*, 650 F.2d 652 (5th Cir. 1981), we observed that "courts have generally denied a right to contribution for attorney's fees and expenses incurred in defense of the action brought by the injured party," but have allowed recovery of attorneys' fees in the indemnification context. *Id.* at 653–54. The rationale for this distinction is that in the indemnity context, the indemnitee's liability "is normally the result of

the act of the indemnitor, who bears the ultimate responsibility for the entire loss." *Id.* at 654. Attorneys' fees are recoverable by the indemnitee in these circumstances because "the indemnitee is required to defend [the] action by an injured party *because of the wrongdoing of the indemnitor*." *Id.* at 654 (emphasis added). By contrast, where the party seeking attorneys' fees is defending against charges of its *own* wrongdoing, "incurring expenses [on attorneys' fees] . . . would be necessary even if there were no other tortfeasors," and so they are "not recoverable in contribution from the other negligent parties." *Id.* at 653, 655; *id.* at 654 (recovery of attorneys' fees not allowed where party "would incur the same legal expenses whether or not other parties were partly at fault for the loss").

We applied these principles in *Sea-Land*. There, a defendant found liable sought indemnification from a third party. *Sea-Land*, 42 F.3d at 962. The district court allocated damages according to the parties' fault, but also awarded attorneys' fees. *Id.* The party awarded attorneys' fees claimed that *Odd Bergs*'s rule did not apply because it "[was] not claiming recovery under a *contribution* theory" but was rather seeking indemnification. *Id.* at 963 (emphasis added). We rejected this argument, holding instead that indemnification "[was] not appropriate in [that] case because [both parties] were found to be at fault," and so the defendant was only "entitled to a contribution (or partial indemnity). . . and no more." *Id.*

There is no doubt that Freightplus's claim against IMC was litigated under a theory of indemnity. The critical question, however, is not whether the theory of recovery is one of "indemnity" or "contribution"; it is whether the justifications articulated in *Odd Bergs* and *Sea-Land* for allowing recovery of attorneys' fees in the typical indemnity context, and not in the contribution context, are present. Here, they are not. Freightplus was not held liable to GIC as a faultless party; the district court held Freightplus liable to GIC because of

No. 15-30975

Freightplus's "failure to ensure an accurate bill of lading," and GIC's detrimental reliance on Freightplus's misrepresentations. Thus, Freightplus's liability flows from *its own* conduct, and so the attorneys' fees expended in that defense "would be necessary even if" IMC were not involved. *Odd Bergs*, 650 F.2d at 653. Freightplus's claim to attorneys' fees is unmoored from the justifications for allowing attorneys' fee awards in the indemnity context.

We therefore agree with the district court's determination that Freightplus is not entitled to recover attorneys' fees from IMC.[22]

**E.**

GIC agreed to pay Freightplus $111,000 for its services. Of this amount, Freightplus agreed to pay Yacht Path $85,000, and Yacht Path agreed to remit $70,000 to IMC. Though GIC paid the amount it owed to Freightplus, and Freightplus paid the amount it owed to Yacht Path, Yacht Path did not remit the monies owed to IMC. The district court held that Freightplus was liable to IMC for the unpaid freight and so awarded IMC $70,309.12, plus pre-judgment interest. We review pure questions of law and mixed questions of law and fact *de novo. Trinity Indus.*, 757 F.3d at 407.

The district court relied on a variety of factors to conclude that Freightplus, rather than GIC, is liable for IMC's freight. Critically, Freightplus

---

[22] Freightplus cites the Eleventh Circuit's decision in *Insurance Co. of N. Am. v. M/V Ocean Lynx*, 901 F.2d 934 (11th Cir. 1990) as establishing that "sole fault or liability on the part of the indemnitor is not a prerequisite to an award of attorneys' fees." *Ocean Lynx* does not support this rule because it does not appear that the indemnitee's liability in that case resulted from any "fault" or wrongdoing on its part. *See Ocean Lynx*, 901 F.2d at 941; *see also SPM Corp. v. M/V Ming Moon*, 22 F.3d 523, 526–27 (3d Cir. 1994) (awarding indemnity where there was "no allegation that the [NVOCC] did anything wrong" and its "liability arose entirely from its contractual relationship with [the shipper] and was trigger by the [ocean carrier's] negligence").

24

No. 15-30975

does not argue on appeal that GIC is liable for IMC's freight; Freightplus's argument is instead that IMC *released* it from liability for freight.[23]

In *Strachan Shipping Co. v. Dresser Indus., Inc.*, 701 F.2d 483 (5th Cir. 1983)[24] a shipper remitted payment to a freight forwarder, but the freight forwarder did not remit the funds intended for the carrier. *Id.* at 484–85. The district court found that the carrier had "extended credit" to the freight forwarder, thus relieving the shipper of freight liability. *Id.* at 489. In reversing, we held that the relevant question for determining whether a carrier has released the shipper from freight liability is "not whether the carrier extended credit to the forwarder, but whether the carrier[ ] intended to release [the shipper] from its obligations and look solely to the forwarder for payment." *Id.* Whether such an intent for release exists "necessarily depends upon the course of dealings of the particular parties, and must be judged from the totality of the circumstances."[25] *Id.*

Applying this approach, we concluded that the carrier did not intend to release the shipper. While the carrier "initially directed its collection efforts to"

---

[23] Freightplus does argue that because it is not listed as a "merchant" on IMC's non-negotiable bill of lading, it cannot be liable for IMC's freight. However, Freightplus does not develop this argument beyond a conclusory sentence, and so we do not consider it. *United States v. Bates*, 850 F.3d 807, 811 n.2 (5th Cir. 2017) ("Because he has failed to adequately develop this insufficiency argument, it is waived. 'Failure of an appellant to properly argue or present issues in an appellate brief renders those issues abandoned.'" (quoting *United States v. Beaumont*, 972 F.2d 553, 563 (5th Cir. 1992))). In any event, we find this argument questionable at best because the IMC non-negotiable bill of lading does not include space for a "merchant" to be listed.

[24] The district court distinguished *Strachan* in the process of concluding that GIC was not liable for IMC's freight, relying on the fact that the shipper in *Strachan* was liable under a credit agreement. *Strachan*, 701 F.2d at 485–86.

[25] This rule has been adopted by multiple other circuits. *See Hawkspere Shipping Co., Ltd. v. Intamex, S.A.*, 330 F.3d 225, 238 (4th Cir. 2003) ("The shipper's duty to pay freight is not discharged, absent evidence that the [ocean] carrier has actually released the shipper from its duty to pay . . . ."); *Nat'l Shipping Co. of Saudi Arabia v. Omni Lines, Inc.*, 106 F.3d 1544, 1545–47 (11th Cir. 1997); *Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 513 F.3d 949, 959 (9th Cir. 2008).

25

the freight forwarder, this fact was "not conclusive." *Id*. We also observed that the designation "freight prepaid" on the bill of lading issued by the carrier to the freight forwarder "indicat[ed] that [the carrier] did not intend to relieve [the shipper] of its obligation[s]." *Id*.

Relying on *Strachan*, Freightplus points to several factors as showing that IMC intended to release it from liability. First, Freightplus argues that IMC's practice of "providing service [to Yacht Path] without contemporaneous receipt of payment is an extension of credit" indicative of an intent to seek freight payment exclusively from Yacht Path. Second, the fact that IMC sought to recover its freight from Yacht Path in the latter's bankruptcy proceeding is, Freightplus argues, also evidence of this intent. Third, Freightplus points to the fact that IMC's non-negotiable bill of lading is marked freight "prepaid," and argues further that IMC is estopped from recovering its freight from Freightplus.

*Strachan* addressed how to determine whether the primary shipper—as opposed to an intermediary—has been released from freight liability by an ocean carrier. While Freightplus is not a shipper in this sense, both parties operate under the assumption that *Strachan*'s framework also applies to determine whether an ocean carrier has released an intermediary from freight liability. We see no reason why *Strachan*'s approach for deciding whether an ocean carrier has released an entity from liability should not apply when it is an intermediary, rather than the primary shipper, being sued for unpaid freight.

We conclude that IMC did not release Freightplus from liability for its freight. First, even assuming that IMC's alleged practice of providing service to Yacht Path in other transactions without "contemporaneous receipt of payment" is an extension of credit in the relevant sense (Freightplus cites no authority indicating that it is), our decision in *Strachan* rejected the argument

that an extension of credit is itself a sufficient indication of a carrier's intent to release a shipper from freight liability. *Strachan*, 701 F.2d at 489. There must be some indication that the extension of credit was intended to serve as a release of liability. There is no logical reason to conclude that IMC intended to look to Yacht Path alone simply because IMC previously provided services to Yacht Path without contemporaneous payment. *See Strachan*, 701 F.2d at 489–90 (finding no intent to release from liability despite extension of credit).

We also reject Freightplus's second argument. In *Strachan*, we held that a shipper was *not* relieved of freight liability to a carrier even though the carrier had "initially directed its collection efforts to" the freight forwarder. *Id.* at 489. Here also, the fact that IMC sought payment for freight from Yacht Path in the bankruptcy proceeding is not sufficient to show an intent on IMC's part to release Freightplus. *Id.*

Last, we cannot divine an intent to release Freightplus from liability solely because of the "freight prepaid" designation on IMC's draft bill of lading. Apart from simply stating the fact that IMC's draft bill of lading listed freight as prepaid, Freightplus provides no explanation for why this indicates an intention by IMC to release Freightplus from liability. In *Strachan*, we did not accept the simple fact of a "freight prepaid" designation as establishing an intent to release, and we will not do so here.[26] *Strachan*, 701 F.2d at 489.

As we observed in *Strachan*, "there is no economically rational motive for the carrier" to release entities from liability: "[t]he more parties that are liable, the greater the assurance for the carrier that he will be paid." 701 F.2d at 490. Given this reality, we are loathe to find release absent a clear indication

---

[26] *See also Nat'l Shipping Co.*, 106 F.3d at 1547 (finding fact issue as to intent to release on facts nearly identical to *Strachan*); *Hawksphere*, 330 F.3d at 238 (adopting *Strachan*'s rule).

of the carrier's intent. Accordingly, because Freightplus has not demonstrated that IMC intended to release it from liability for the unpaid freight, we affirm the district court's judgment in this regard.

**F.**

While holding that Freightplus was liable to IMC for its unpaid freight, the district court also determined that IMC could not recover its freight from GIC by bringing an *in rem* action against the REBEL. Relying on out-of-circuit precedent and "principles of equity," the district court concluded that such recovery would impermissibly subject GIC to double payment—the first payment being its payment of $111,000 to Freightplus. We review legal issues and mixed-questions of law and fact *de novo* and any underlying factual finding for clear error. *See Trinity Indus.*, 757 F.3d at 407.

"Under United States law, it has been settled for over a century that we presume a maritime lien exists in favor of a shipowner on cargo for charges incurred during the course of its carriage." *Arochem Corp. v. Wilomi, Inc.*, 962 F.2d 496, 499 (5th Cir. 1992); *see The Bird of Paradise*, 72 U.S. 545, 554 (1866)); *see also* 2 Benedict on Admiralty § 44 (Matthew/Bender 2013) ("[M]aritime law permits an action *in rem* against the cargo itself . . . ."). Under this well-established principle, IMC obtained a maritime lien against the REBEL *in rem*. The district court recognized these principles but concluded that IMC could not exercise a maritime lien against the REBEL *in rem* by relying on a "well-reasoned consensus" that a shipper is relieved of liability for freight where the shipper has (1) remitted payment for freight to an intermediary and (2) where the ocean carrier's bill of lading is marked freight prepaid.

We disagree. As already discussed, we articulated the standard for determining whether a shipper has been released from freight liability by the ocean carrier in *Strachan*. *See* 701 F.2d at 489–90. There we held that this

inquiry must focus on the ocean carrier's intent, which is determined from the "totality of the circumstances." *Id.* at 489.

The district court did not follow the course set by *Strachan*, though recognizing that *Strachan* was "contrary" to the rule is applied. In *Strachan*, we rejected the argument that a "freight prepaid" designation on a bill of lading is necessarily sufficient. 701 F.2d at 489. Likewise, we made clear that the *carrier's* intent is paramount, and so we cannot discern anything about IMC's intent from GIC's act of remitting payment to an intermediary. *Cf. Strachan*, 701 F.2d at 489. In short, neither of the district court's reasons evidence an intent *by IMC* to release its maritime lien against the REBEL.

We recognize that *Strachan* involved an action for freight against the shipper itself, whereas here IMC seeks to recover against the REBEL *in rem*. In both situations, however, the relevant question is whether the ocean carrier took action to release a source liable for unpaid freight from liability. We see no reason to apply a different standard for discerning a carrier's intent to release in the context of an *in personam* action than an *in rem* action.[27] We therefore conclude that the district court erred in barring IMC's maritime lien against the REBEL *in rem*.[28]

On appeal, GIC does not defend the district court's rationale. It instead argues that the REBEL is not subject to a maritime lien because "there must exist privity of contract" between the cargo owner and the ocean carrier in

---

[27] We do not suggest that *in personam* and *in rem* actions are to be treated identically in all respects or that standards applicable to one type of action are necessarily applicable to the other. Instead, we merely recognize that when it comes to discerning whether the carrier effected a release of liability—whether in the context of an *in personam* or *in rem* action— courts should look to whether the carrier intended such a release and should assess this intent based on the totality of the circumstances.

[28] It is true that a maritime lien can be waived. *See* 2 Benedict on Admiralty § 44 (Mathew Bender 2013). GIC has made no argument to this effect.

order for a maritime lien to attach. For this, GIC relies on our decision in *Lykes Lines Ltd. v. M/V Bbc Sealand*, 398 F.3d 319 (5th Cir. 2005).

GIC misreads *Lykes*. That decision acknowledged that "maritime law recognizes a lien arising as a matter of law in favor of the vessel owner against the cargo for charges including unpaid freight." *Lykes*, 398 F.3d at 323. An exception to this rule applies "when cargo is shipped *under a charter*," in which case "[the] lien only extends to cargo that is owned by the charterer." *Id*. (emphasis added). A "charter" is a maritime term for the contract arising between the shipowner and the party leasing the ship to transport cargo. *See* BLACK'S LAW DICTIONARY 285 (10th ed. 2009) ("charter" and "charterparty"). But not all contracts for maritime transportation are charters. A charter "is a specialized form of contract for the hire *of an entire ship*." 2 Schoenbaum, *Admiralty & Maritime Law*, § 11-1 (West 2001) (emphasis added). These are contracts securing "private carriage," as distinct from carriage by a "common carrier" who "is available to carry cargo for all who agree to pay its charges." 8 Benedict on Admiralty § 18.01 (Matthew/Bender 2013).

The REBEL was not shipped under a charter, and no party has argued that it was. While Yacht Path arranged for the REBEL to be shipped upon IMC's vessel, it did not "hire [the] entire ship" or otherwise secure private carriage for the REBEL. 2 Schoenbaum, *Admiralty & Maritime Law*, § 11-1; 8 Benedict on Admiralty § 18.01. Mr. Cummings of Yacht Path confirmed that the REBEL was not shipped under a charter. *Lykes* has no bearing here.

Accordingly, we hold that the district court erred in barring IMC from proceeding against the REBEL *in rem*.[29]

---

[29] Because we conclude that IMC has a right to exercise its maritime lien against the REBEL *in rem*, we need not address the issue of IMC's contractual lien against the REBEL.

No. 15-30975

## III.

We have come at long last to the end of our own voyage through the assorted issues raised by this appeal and, save for one issue, we drop anchor at the same destination as the district court. Accordingly, we REVERSE the district court's judgment disallowing IMC's *in rem* action against the REBEL and AFFIRM the judgment in all other respects.

No. 15-30975

LESLIE H. SOUTHWICK, Circuit Judge, dissenting in part.

My disagreement with the majority concerns its analysis of the issue of authentication of the invoice from Visifi Nigeria Limited. I do not believe there was a stipulation. Accordingly, the exhibit on which most of the damage award is based was never properly admitted into evidence.

There were two documents that allegedly provided evidence of the REBEL's storage costs. One was the Visifi invoice. The other was an invoice from Julius Berger Services, the party storing the REBEL. The two documents are quite different. The Visifi invoice lists "demurrage" fees at $1,400 per day, totaling over $1 million by the end of January 2015. The Julius Berger invoice lists "Tug storage" at $220 per day, totaling $120,120 as of March 25, 2015. The Visifi invoice lists security fees, a national inland waterway fee, impoundment fees, and overhauling fees, totaling over $400,000. The Julius Berger invoice lists stevedoring fees, mooring fees, labor and documentation fees, and taxes, totaling approximately $17,000. The Visifi invoice provides a Lagos, Nigeria address. The Julius Berger invoice provides a Warri, Nigeria address. The Visifi invoice lists a grand total of $1,460,200 as of the end of January 2015. The Julius Berger invoice lists a grand total of $151,169.08 as of April 13, 2015. The parties dispute whether these documents complement one another or offer alternative calculations of storage-related costs.

The Julius Berger invoice was admitted without objection in the district court. Before trial, GIC submitted the Julius Berger invoice to the court as "a true and correct copy of its damages reflected in and to supplement [the Visifi invoice]." During trial, GIC's witness testified regarding the "demurrage" charges it was incurring from Julius Berger. At the end of trial, GIC moved to enter the Julius Berger invoice into evidence without objection, informing the court that the invoice reflects "[t]he storage charges."

Freightplus and IMC consistently objected to the introduction of the Visifi invoice in the district court, and that document was never discussed at trial. Two months before trial, the parties objected to the Visifi invoice because they alleged it was not produced during the discovery period, was not relevant, and was not properly authenticated. The district court overruled most of the objections, but it deferred on authentication because the document could "be authenticated at trial by witness testimony."

In a proposed pretrial order filed the week before trial, GIC listed the exhibits it planned to introduce at trial. The list included the Visifi invoice and four other exhibits that Freightplus and IMC objected to on grounds of authentication: "Shell Petroleum Contract and all related documents, P.O. No: 4510244867," "ZED Energy Contract and all related documents, ZED 1021012 PO No. ZED/GIC/13/VOL.11/09," "Shell Petroleum Contract and all related documents PO No. 4510330438: $1,047,000.00," and the "GIC Agency Authorization from GIC Oil and Gas Services, Ltd." The proposed pretrial order also listed Godwin Ebolo as a GIC witness, saying this about his proposed testimony:

> Mr. Ebolo will give testimony in his capacity as managing director of GIC Oil and Gas Services, LTD regarding the relationship between the two entities. His testimony is also necessary to authenticate Shell Petroleum Contract and all related documents, P.O. No: 4510244867, ZED Energy Contract and all related documents, ZED 1021012 PO No. ZED/GIC/13/VOL.11/09, Shell Petroleum Contract and all related documents PO No. 4510330438: $1,047,000.00, and GIC Agency Authorization from GIC Oil and Gas Services, Ltd.

GIC did not explain in the proposed pretrial order how it would authenticate the Visifi invoice. It did, however, note that it would call "[a]ny witness needed to authenticate any documents that cannot be agreed to by stipulation."

The final pretrial order continued to list the Visifi invoice, the three contracts, and the agency agreement as GIC exhibits.  It also noted the objections filed by Freightplus and IMC.  The final pretrial order did not list Godwin Ebolo as a GIC witness, but it continued to state GIC would call "[a]ny witness needed to authenticate any documents that cannot be agreed to by stipulation."

At trial, GIC called Godwin Ebolo to testify.  The following exchange took place:

> [GIC]: Your Honor, I'd like to call Mr. Godwin Ebolo as my authentication federal witness.
>
> [Freightplus]: Your Honor, we would object to this witness testifying. He was not listed in the pretrial order.  To the extent that he's called specifically for a Rule 901 authentication, we will stipulate, and I think —
>
> [IMC]: We'll stipulate as well, Your Honor.
>
> [GIC]: All right.  And that's all he was going to testify to, nothing substantive, just to authenticate those documents that Freightplus and IMC both objected to, which are the three contracts and the agency agreement.
>
> THE COURT: All right.  So do we have a stipulation?
>
> [Freightplus]: Yes.  As far as Freightplus, yes.
>
> [IMC]: As far as IMC as well.
>
> THE COURT: Okay.  Well, sir, you can go home.  Oh, you still want to call him?
>
> [Freightplus]: He's been excused.
>
> [GIC]: Oh, wait.

[Freightplus]: We stipulated to authentication.  There's no — if that's the only purpose he would be testifying.

[GIC]: Yeah. He's testifying for authentication.

[Freightplus]: We've stipulated to authentication.

[GIC]: Oh, you have?

[Freightplus]: Yes.

[GIC]: Oh, all right. I'm sorry. I heard you wrong.

[Freightplus]: No.

[GIC]: Okay.

THE COURT: So you can go home.

Whether this stipulation extended to the Visifi invoice, or just "the three contracts and the agency agreement," is the central dispute.

After trial, the district court awarded over $1.8 million to GIC based almost entirely on the Visifi invoice, which it relied on instead of the Julius Berger invoice.  Both Freightplus and IMC filed Rule 59(e) motions in which they objected to the district court's use of the Visifi invoice.  They argued the invoice was not properly authenticated and did not accurately represent the REBEL's storage charges, which were detailed in admitted invoices provided by Julius Berger — the entity actually storing the REBEL.

The district court denied the Rule 59(e) motions.  Pointing to the portion of the trial transcript reproduced above, the court concluded that "counsel for both Freightplus and IMC apparently proffered a blanket Rule 901 authentication stipulation for Godwin Ebolo's testimony before GIC's counsel then responded regarding the documents to be authenticated."  The court explained that it "fairly took the intent of counsel for Freightplus and IMC to

35

be to stipulate as to authentication generally." The court also rejected the argument that it was clear and manifest error to find the Visifi document "a more credible foundation for determining GIC's damages" than the Julius Berger invoice.

IMC later filed a Rule 60(b) motion notifying the court of new evidence demonstrating that the Visifi invoice did not accurately reflect storage charges for the REBEL. This new evidence was a document just like the original Julius Berger invoice but updated to reflect current charges. The total demanded in the invoice for release of the REBEL was just over $186,000. IMC argued this document demonstrated that the Julius Berger invoice represented accurate storage-related costs and suggested that GIC knew the invoice represented accurate costs because Julius Berger was demanding payment from GIC. The district court denied the motion.

Freightplus has settled with GIC, but IMC continues to argue that the district court erred in awarding damages to GIC based on the Visifi invoice. Whether the invoice was ever authenticated is the issue.

"Authentication is a condition precedent to the admission of evidence and is satisfied when a party presents evidence sufficient 'to support a finding that the item is what the proponent claims.'" *United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) (quoting FED. R. EVID. 901(a)). We review challenges to evidentiary rulings for abuse of discretion. *See EMJ Corp. v. Hudson Specialty Ins. Co.*, 833 F.3d 544, 551 (5th Cir. 2016). "We only reverse if 'substantial prejudice' resulted from the error." *Id.* "Resolution of preliminary factual questions concerning the admissibility of evidence are reviewed for clear error." *Meadaa v. K.A.P. Enters., L.L.C.*, 756 F.3d 875, 880 (5th Cir. 2014). "[A] finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Fed. Sav. & Loan Ins. Corp.*

No. 15-30975

*v. Texas Real Estate Counselors, Inc.*, 955 F.2d 261, 265 (5th Cir. 1992) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

I find clear error. GIC, the party introducing the authentication witness, clearly defined the scope of the stipulation to include "the three contracts and the agency agreement." The scope of the stipulation must have made sense to the parties, because the proposed pretrial order that listed Godwin Ebolo as a witness stated he would authenticate three contracts and one agency agreement. The stipulation at trial did not mention the Visifi invoice.

The majority characterizes the transcript as showing that Freightplus and IMC offered to stipulate before GIC interjected with "qualifying language." There is no indication, however, that the parties offered a "blanket stipulation." Looking at the context, the transcript makes clear that before Freightplus could complete its sentence, IMC jumped in to say it would also stipulate, and GIC immediately responded, "All right. And that's all he was going to testify to, nothing substantive, just to authenticate those documents that Freightplus and IMC both objected to, *which are the three contracts and the agency agreement.*" Only then — *after* GIC's statement — did the district court ask the parties, "So do we have a stipulation?" At that point, what was explicitly before the court as an explanation of the stipulation, to which no one objected, is that it applied to the three contracts and the agency agreement, not the Visifi invoice.

The Visifi invoice is especially problematic because GIC wholly failed to explain it in the district court, yet it alone supports the majority of the damages awarded to GIC. As already noted, GIC introduced the Julius Berger invoice to the court before trial as "a true and correct copy of its damages reflected in and to supplement" the Visifi invoice. At trial, GIC's witness testified about "demurrage" charges from Julius Berger, not Visifi. At the end of the trial, it was GIC who moved to introduce the Julius Berger invoice into evidence

37

without objection, explaining to the court that the Julius Berger invoice reflected "[t]he storage charges." There is no dispute that Julius Berger stored the REBEL. GIC provided no information at all about the Visifi invoice. Its relevance remains obscure, to say the least, though the district court found it relevant. As IMC points out, "there is no explanation anywhere in the record of who Visifi Nigeria Limited is, why they are providing the document, and from where the information contained within the document is obtained."

In light of both the district court's and my colleagues' contrary view, there must be reasonable doubt about what the stipulation covered despite my sense there is none. Consequently, instead of simply holding that the Visifi invoice never was authenticated and it is too late now, I would reverse and remand to the district court for a hearing on the Visifi invoice that would allow it to be authenticated if that can be done, and also a new decision as to its relevance once someone explains what Visifi is.

I respectfully dissent on that issue.